**E-FILED**
Friday, 08 November, 2013  11:56:19 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| FIDLAR TECHNOLOGIES, )<br><br>Plaintiff, )<br>v. )<br>)    Case No. 4:13-cv-4021-SLD-JAG<br>LPS REAL ESTATE DATA SOLUTIONS, )<br>INC., )<br>)<br>Defendant. )<br>LPS REAL ESTATE DATA SOLUTIONS, )<br>INC., )<br>)<br>Counter-Claimant, )<br>)<br>v. )<br>)<br>FIDLAR TECHNOLOGIES, )<br>)<br>Counter-Defendant. )<br>) | |

ORDER

LPS Real Estate Data Solutions, Inc. ("LPS") is suing Fidlar Technologies ("Fidlar") for telling third parties that LPS engaged in illegal conduct, thereby causing those parties (here, county officials) to break their contracts with LPS. According to LPS, Fidlar's damaging words give rise to causes of action for tortious interference with contract and tortious interference with business expectancy. LPS also seeks a preliminary injunction from the Court to prevent further harm arising from this interference. *See* ECF No. 9 and 14. For reasons discussed below, the Court finds that Fidlar's statements to the counties were privileged, and accordingly denies LPS's motions for injunctive relief.

Also before the Court is Fidlar's Complaint against LPS for computer fraud and tampering and trespass to chattels.  LPS moves to dismiss Fidlar's Complaint, *see* ECF No. 35, which the Court denies for reasons set out below.

**BACKGROUND**

**Fidlar Technologies' Software Services to Counties**

Fidlar is a technology company incorporated in Michigan, with its principal place of business in Rock Island, Illinois.  Fidlar markets its services to a number of governmental entities in the Midwest, such as county clerks' offices, who engage Fidlar to make public records available over the Internet.  Evid. Hr'g Tr. at 129–34.[1]  To that end, Fidlar sells the counties its Laredo program, a computer program that facilitates public access to the counties' records.[2]  *Id.* Members of the public interested in accessing the counties' records online download Laredo, sign an End-User Agreement, and obtain a username and password from the county.  Once a user logs into Laredo with her username and password, she can search for and view the public records for that county online.  *Id.* at 80.  Laredo is designed to track the time a user spends logged into the program.  *Id.* at 227–28.

The convenience of online access comes at a price, though, as the counties charge users a subscription fee for access to Laredo, usually on a per-minute or monthly basis.  *See* Evid. Hr'g LPS Ex. B.  Laredo is also designed to prevent users from downloading or electronically capturing the documents they view, and a user that desires a copy of a public record must pay the

---

[1] Citations to the transcript of the evidentiary hearing held on May 17, 2013, are designated as "Evid. Hr'g Tr. at __."  Citations to the parties' exhibits presented during that hearing are referred to as "Evid. Hr'g LPS Ex. __" or "Evid. Hr'g Fidlar Ex. __."  Citations to depositions are designated as "[Name] Dep. at ___."

[2] Laredo is usually not purchased on its own, but as part of a suite of software that costs about $100,000.  Evid. Hr'g Tr. at 130–34.  About 40% of Fidlar's county clients also hire Fidlar to host their data on Fidlar's servers.  *Id.* at 200–01.  The initial charge to load a county's information onto Fidlar's servers is about $2000 or $3000, plus $500 quarterly.  *Id.*

county a fee to print it.  *Id.*; Evid. Hr'g Tr. at 224.  Fidlar is not merely aware that Laredo enables the counties to make money from users' viewing and printing public documents, it markets Laredo as a revenue-generator for the counties.  *See* Evid. Hr'g Tr. at 136 (quoting Scott Moore Dep. at 140); *see also* Sandy Leitheiser Dep. at 10 ("[T]his entire issue comes down to a revenue loss for [our county][.]").  Fidlar receives a portion of the subscription revenue that the counties collect, but none of the fees that the counties charge to print.  Ultimately, only the counties (not Fidlar) determine whether to grant a public user access to Laredo and what price to charge for access and printing.  Evid. Hr'g Tr. at 137, 140, 184.

### LPS's Collection of Property Data from Public Records

LPS is a real estate data analytics company incorporated in California with its principal place of business in that state.  LPS gathers, aggregates, and standardizes real property data for a variety of customers, including mortgage companies, banks, real estate companies, and title industry representatives.  Evid. Hr'g Tr. at 31–34.  LPS obtains property data from public record sources—primarily county assessor and recorder offices—then standardizes that data, aggregates it with information from third parties, and licenses it to its customers.  *Id.*  All of this is done on a vast scale: of the 3,142 county recorders' offices in the nation, LPS has relationships with 2,600 of them to access their public information.  *Id.* at 64.  LPS's ultimate success is dictated by the completeness, accuracy, and timeliness of the data that it collects and sells.  *Id.* at 51.

LPS uses several methods to collect its property data.  The most preferable option, from LPS's standpoint, is to contract with counties to receive bulk image transfers of electronic records via a file transfer protocol (FTP) or on a media device like a USB drive.  Evid. Hr'g Tr. at 40, 71–73.  If a bulk data transfer is not feasible or not offered by a county, then LPS uses software like Laredo to view records online (as will be discussed in more detail below).  There

are also less preferable ways for LPS to collect public record data, such as receiving documents on microfilm or microfiche, obtaining paper copies, or engaging in field collection. *Id.* at 72–73. Field collection is especially problematic in LPS's view because it requires LPS to train contract workers to physically enter county recorders' offices and manually transcribe data. *Id.* at 53–54. Field collection is limited not only by the slow pace at which the contractors can copy the desired information from the records, but also by the fact that some counties prohibit electronic equipment in their offices, thus requiring the contractors to transcribe the information longhand. *Id.* at 38, 53–54. Given the tedious nature of this work, it is not surprising that there is significant turnover among contractors, which further weighs against LPS using field collection whenever possible.

Of the methods for collecting public records data that LPS has at its disposal, LPS's use of Laredo is the most relevant here. LPS contracts with approximately 81 counties to access their public records over the Internet using Laredo. Evid. Hr'g Tr. at 44–45; Evid. Hr'g LPS Ex. B. LPS resorts to using Laredo in these counties because obtaining the records via bulk data transfer is not an option, and Laredo is still preferable to the more cumbersome methods of data collection. Evid. Hr'g Tr. at 46, 70. Like any other Laredo user, LPS pays each of these counties a monthly subscription fee based on LPS's use of Laredo; executes an End-User Agreement; and receives a username and password from each county. *See* Evid. Hr'g Ex. B. But LPS's actual use of Laredo differs very much from that of the regular user, and forms the basis of this case.

### LPS's Use of Web Harvesting Software to Access Laredo

As discussed above, Laredo allows users to search for and view public records. But a user can only view documents one-at-a-time, and cannot electronically capture or download

them onto her own computer.  Thus, if a Laredo user wants to keep the information contained in a public record, she would have to either manually transcribe the data or pay the county a fee to print a copy of the document.  *See* Evid. Hr'g Tr. at 47.  These limitations make using Laredo more expensive and time-consuming than LPS prefers.  *Id*.  LPS therefore developed a computer program that enables it to electronically capture the information contained on public records, at a faster rate than normally possible and without incurring print fees.  This program is commonly referred to as a "web harvester"; web harvesting generally refers to the creation of a computer code in order to acquire data from images.  *Id.* at 80.

To create its web harvester, LPS first downloaded Laredo, logged in with its username and password, and searched for a public record.  Evid. Hr'g Tr. at 80.  Using an HTTP Analyzer, LPS then viewed and saved the resulting traffic.  Evid. Hr'g Tr. at 81.  Traffic is the trail left on a computer after completing certain actions; in this case, the traffic that LPS viewed and downloaded consisted of commands between Laredo's web interface and the counties' (or, in some cases, Fidlar's) servers whenever a user logs in and searches for records.  *Id.* at 81, 100–02.  Fidlar wrote these commands specifically for the Laredo program, but upon viewing them LPS observed that they conformed to a SOAP protocol, which is a common protocol for communicating with servers.  *Id.* at 83, 98–99.  By isolating and analyzing the SOAP calls (or commands) that Laredo sent to the servers, LPS was able to identify the specific calls that yielded certain data contained in the records.  *Id.* at 84.  LPS then used those specific calls to create a program that harvested information from county servers in a way not possible for the typical Laredo user.

To operate its web harvester to access records in a given county, an LPS employee would

manually start the program, which then connects to the servers containing the county's records.[3] Evid. Hr'g Tr. at 86–87. The web harvester then queries the servers for records, streams the images of the records one at a time (although at a much faster rate than could be accomplished manually), and saves the data that comprises those images. *Id.* at 88, 91–92. The most important practical effect is that the web harvester allows LPS to download data contained in public records without paying the counties to print them and without having to manually transcribe the desired information. LPS's use of the web harvester also prevents Laredo from recording the minutes LPS logs on the program or the documents LPS searches for. *Id.* at 96, 112. Prior to this lawsuit, LPS would typically run its web harvesters once or twice a week in the counties where it had a Laredo contract. *Id.* at 91. LPS would then send the captured data to a vendor that manually inputs the information from the records into a database owned by LPS. *Id.* at 108. LPS then standardizes the data, supplements it, and sells it to its customers. *Id.* at 31, 33.

Not surprisingly, LPS never sought or received consent from Fidlar or the counties to copy the traffic from Laredo or to save the data contained in the images of public records. Evid. Hr'g Tr. at 97. But LPS would review its subscription contract with a given county before using a web harvester to access Laredo there, and in LPS's view none of its contracts prohibited LPS from using its web harvester. *Id.* at 68, 75. Nor did any county ever affirmatively tell LPS that its use of a web harvester was prohibited. *Id.* Nevertheless, the counties and Fidlar were not pleased when they found out what LPS was doing.

---

[3] When LPS starts the web harvester, it automatically connects to a county's servers without LPS having to enter its username and password each time. This is because LPS previously identified, within the Laredo traffic, the unique identifier that Laredo assigned to LPS when LPS first logged in. Evid. Hr'g Tr. at 88–89, 107. LPS's use of this ID to automatically connect to the servers is basically a shortcut that allows LPS to access the same data as if it had logged in conventionally.

**Fidlar's Discovery of LPS's Web Harvesting**

Beginning in January 2012, a number of counties that had purchased Laredo from Fidlar began contacting Fidlar to express concern regarding LPS's use of the program.  While LPS had paid the counties a monthly fee to access public records via Laredo, it appeared to the counties that LPS was not logging any minutes.  *See, e.g.,* Ronald Voigt Dep. at 17; Cheryl Cochran-Wilson Dep. at 14–17; Julie Kae Kalkbrenner Dep. at 13–16.  In response, Fidlar conducted an internal audit of LPS's Laredo use, which revealed that LPS was indeed conducting searches on Laredo without logging minutes.  Evid. Hr'g Tr. at 221.  The audit also showed that, in approximately 74 counties, LPS was using a web harvester to download documents from the counties' (and, to a lesser extent, Fidlar's) servers.  Evid. Hr'g Tr. at 221–25.  Fidlar memorialized the audit in written reports that summarized Fidlar's findings and made specific reference to "illegal" searches on LPS's part.  Evid. Hr'g LPS Ex. C.

In light of the audit reports, Fidlar recognized that LPS's conduct could have a potentially negative impact on the relationship between Fidlar and the counties, since Fidlar marketed its software as a way for the counties to gain revenue from print fees.  Evid. Hr'g Tr. at 135–36, 141–42; Evid. Hr'g LPS Ex. L.  That revenue from print fees would disappear if LPS could save the data from public records on its own computers.  Fidlar thus commenced two courses of action: developing an upgrade of Laredo to prevent web harvesting, and contacting the affected counties.

**Fidlar's Communications with the Counties Regarding LPS's Web Harvesting**

In late February 2013, Fidlar President and Co-owner Ernest Riggen personally called Dawn Young, Recorder of Deeds for Whiteside County, Illinois, and informed her of LPS's activities.  Evid. Hr'g Tr. at 210–11.  A week later, Young unilaterally terminated LPS's Laredo

access in Whiteside County.  *Id.*; Evid. Hr'g LPS Ex. J-8.  Shortly thereafter, Fidlar Vice President of Sales and Marketing Scott Moore began calling each affected county regarding LPS's web harvesting, making over 300 calls to about 60 counties in all.  Evid. Hr'g Tr. at 128, 143–44. While there is no record of what exactly Moore said on those calls, his prepared talking points stated that Fidlar had discovered LPS's web harvesting; that LPS had gained "improper" access to Fidlar's system and had engaged in "unauthorized" use of Laredo; that the county records had been "compromised"; and that Fidlar was considering legal action against LPS.  *Id.* at 148–51 (quoting Moore Dep. at 82, 91).  Some county recorders who were party to the calls later confirmed that Moore described LPS's access as "unauthorized."  *See* Kalkbrenner Dep. at 10; Cochran-Wilson Dep. at 9; Leitheiser Dep. at 25; Voigt Dep. at 12–13.

On March 8, 2013, Fidlar sent a newsletter to every county where LPS had a Laredo account.  Evid. Hr'g LPS Ex. D.  The newsletter discussed LPS's web harvesting and indicated that Fidlar would be releasing a new version of Laredo that would prevent it in the future.  The letter also stated that the counties could "stop this type of web harvesting by calling or emailing us and we will eliminate [LPS's] Laredo account in your county."  *Id.*  On March 11, 2013, Fidlar filed its Complaint against LPS in this Court alleging causes of action under the Computer Fraud and Abuse Act, the Illinois Computer Crime Prevention Law, and also for trespass to chattel.  *See* ECF No. 1.  Riggen forwarded a copy of the Complaint to the recorders of the counties listed in the Complaint, and told them: "I am sending you a copy because we have made the decision to include actual evidential examples of the type of fraud committed . . . ."  Evid. Hr'g LPS Ex. O, P; Evid. Hr'g Tr. at 207–08.  In an email to the recorder for Clay County, Minnesota, Riggen said he was "sickened" by LPS's behavior.  Evid. Hr'g LPS Ex. O; Evid. Hr'g Tr. at 205.

On March 13, 2013, Fidlar sent another newsletter to the counties that discussed the web harvesting activities of two unnamed companies, and indicated that Fidlar had filed suit against both companies.  Evid. Hr'g LPS Ex. E.  The newsletter closed by saying: "It doesn't surprise us that we must continue to be vigilant in this area.  What does surprise us is the lengths some will go to collect YOUR information.  As your partner, we will always go to extreme lengths to help make sure YOU ARE THE SOURCE!"  *Id.*  At about that time, Fidlar also began sending counties the audit reports it had prepared for the 74 counties where LPS was a Laredo user: those reports referred to LPS's searches as "illegal."  Evid. Hr'g Tr. at 164–69, 225; Evid. Hr'g LPS Ex. C.

Beginning in mid-March, 2013, Fidlar conducted state-wide conference calls with the recorders of deeds from Illinois, Indiana, Minnesota, Missouri, and Wisconsin with whom Fidlar had relationships.  *See* Evid. Hr'g LPS Ex. H, I, Q.  In anticipation of the conference calls, Fidlar emailed the recorders a diagram depicting how Fidlar thought LPS had obtained "foreign" access of Laredo with its web harvester.  Evid. Hr'g LPS Ex. F.  On each conference call, Fidlar Director of Operations Adam Watkins walked through the contents of the audit report that had been sent to the counties.  Evid. Hr'g Tr. at 170.  Watkins and Scott Moore then took questions from the county recorders.  During the Minnesota conference call, the following exchange took place:

> FEMALE VOICE:  So with this proof that you have, is that enough to terminate their Laredo contract with no notice?
>
> SCOTT MOORE:  That's a decision you have to make.  I -- I-- you have to understand that with our current situation and with the fact that we have a lawsuit filed against them, we have to be a little careful on how we recommend and what we can and can't say in that regard.

FEMALE VOICE:  (Inaudible) -- easy.[4]

SCOTT MOORE:  Yeah.  If you could see my head nodding in a certain direction, that might help you.

Evid. Hr'g LPS Ex. I, at 13:19–15:9.  Moore later confirmed that he was shaking his head "yes," and that he intended to convey that the counties had sufficient reason to terminate LPS's Laredo contract without notice.  Evid. Hr'g Tr. at 172–73.

The conference call with the Indiana recorders was also attended by Ernest Riggen.  In response to a question about the nature of Fidlar's lawsuit against LPS, Riggen stated: "[T]hey have broken several state and federal laws by circumventing the user interface of our software and, for lack of a better term, hacking into the servers at our location."  Evid. Hr'g LPS Ex. H, at transcript 32:7–10.

### The Counties Terminate LPS's Laredo Access and Install Laredo Upgrade

In response to the communications from Fidlar discussed above, in March of 2013 a number of counties began unilaterally cutting off LPS's access to Laredo.  Evid. Hr'g Tr. at 49–50.  Of the 81 counties with whom LPS had Laredo contracts, 42 eventually terminated LPS's Laredo account.  *Id.*  Each of those 42 counties had been contacted by Fidlar; some county recorders later stated that they terminated LPS based on information received from Fidlar.  *See* Kalkbrenner Dep. at 12; Voigt Dep. at 17; Cochran-Wilson Dep. at 17–19; Leitheiser Dep. at 26–27.  At the time of termination, though, the counties provided LPS a variety of reasons for shutting off its Laredo accounts, such as breach of contract, discrepancies in Laredo usage, questionable activity, gaining unauthorized access to portions of Laredo, inactivity, and the pending lawsuit by Fidlar.  *See* Evid. Hr'g LPS Ex. J.  Some of the counties gave LPS no

---

[4] According to LPS, and upon the Court's own review, the inaudible comment was, "Come on, Scott, we wanted it easy."  Evid. Hr'g Ex. I, at recording 13:48.

explanation at all.

Additionally, many affected counties authorized Fidlar to install an upgrade of Laredo that prevents web harvesting by encrypting Laredo's traffic.  Evid. Hr'g Tr. at 232.  Of the 81 counties that have Laredo contracts with LPS, approximately 60 have upgraded.  *Id.*  Even though the upgrade disables LPS's ability to web harvest, some of the counties that initially terminated LPS's Laredo access have still not reinstated it post-upgrade.  Evid. Hr'g Tr. at 56.

According to LPS, the counties' actions have had dire consequences for LPS's business. LPS's success is governed by the timeliness and completeness of the property data it collects, and LPS has been unable to keep its data current in those counties that terminated its Laredo access.  Evid. Hr'g Tr. at 51–56.   While LPS has not undertaken alternate means to gather data in those counties that terminated its Laredo account, LPS claims this is because such options are either unavailable or not feasible.  Evid. Hr'g Tr. at 60–67.  For example, LPS has not resorted to field collection due to its slow and cumbersome nature; according to LPS, it would take about six to eight months to get field collection efforts up and running in each of the 42 counties that terminated LPS's Laredo access.  *Id.* at 276.   Similarly, in the counties where LPS still has a valid Laredo account, and where the Laredo upgrade was installed, LPS has not used Laredo to collect data because it considers the conventional way of using the program (i.e. without web harvesting) to be nearly as inefficient as manual field collection.  Evid. Hr'g Tr. at 74.

### The Present Litigation

Following the aforementioned actions taken by Fidlar and the counties, this litigation quickly escalated.  On April 8, 2013, LPS filed its Motion to Dismiss Fidlar's Complaint, ECF No. 6, and its Counterclaim against Fidlar alleging tortious interference with contract and business expectancy, ECF No. 8.  LPS concurrently moved for a temporary restraining order and

preliminary injunction prohibiting further disparaging communication between Fidlar and the counties and ordering Fidlar to ask the counties to restore LPS's Laredo access pending this litigation.  ECF No. 9.  LPS also sought a declaratory judgment from the Court that the counties' use of Laredo to make their public records available violates Illinois' Freedom of Information Act.

Following a hearing on April 15, 2013, the Court denied LPS's Motion for a TRO, finding that the evidence presented at that point only showed that Fidlar had made truthful statements to the counties regarding LPS's actions.  The Court set the matter for an evidentiary hearing on May 17, 2013, regarding LPS's request for a preliminary injunction, with expedited discovery to be completed in the interim.  Prior to the evidentiary hearing, LPS filed another motion for a temporary restraining order to bar Fidlar's release of the Laredo upgrade.  ECF No. 14.  At the May 17, 2013, hearing, the Court heard evidence and argument from the parties and took the matter under advisement.  Now before the Court are LPS's Motion to Dismiss Fidlar's Complaint and motions for injunctive relief, which the Court rules on in turn.

## DISCUSSION

### I. LPS's Motion to Dismiss Fidlar's Complaint

In its Complaint, Fidlar claims that LPS's use of web harvesting software violates the Computer Fraud and Abuse Act, the Illinois Computer Crime Prevention Law, and also constitutes trespass to chattel under the common law.[5]  *See* ECF No. 31-1.  LPS moves to dismiss all three counts of the Complaint.

A motion to dismiss pursuant to Rule 12(b)(6) does not resolve the merits of a particular

---

[5] On June 14, 2013, Fidlar moved to amend its original Complaint. *See* ECF No. 31.  The Court granted Fidlar's motion on June 21, 2013, and substituted Fidlar's Amended Complaint as the underlying complaint in this action.

claim, but rather tests only the sufficiency of the allegations set forth in the complaint. Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" A complaint must "state a claim to relief that is plausible on its face," meaning that the plaintiff has pleaded sufficient facts for a court to draw the "reasonable inference" that the defendant is liable. *Bell Atl. Corp. v. Twombly*, 550 U.S. at 570; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plausibility standard, while demanding less than a probability, "asks for more than a sheer possibility that a defendant has acted unlawfully," *Iqbal*, 556 U.S. at 678, and is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense," *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 679) (internal quotations omitted). In making such a determination the court must accept the well-pleaded facts in the complaint as true but may disregard legal conclusions or recitations of the elements of the claim. *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555.

The purpose of notice pleading under Rule 8 is to give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests, *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) (citing *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) and *Twombly*, 550 U.S. at 555), and to weed out factual allegations that are so "sketchy or implausible" that they fail to provide adequate notice to the defendant of the plaintiff's claim, *id.* (citing *Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663, 667 (7th Cir. 2007). In other words, "the plaintiff must give enough details about the subject-matter of the case to present a story that holds together," a task that will vary along with the complexity of the case. *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404–05 (7th Cir. 2010) ("A more complex case . . . will require more detail, both to give the opposing party notice of what the case is all about and to show how, in the

plaintiff's mind at least, the dots should be connected.").

**A.  The Computer Fraud and Abuse Act**

The Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA"), generally proscribes computer fraud and hacking.  While primarily a criminal statute, the CFAA also provides for a private right of action for civil plaintiffs.  The statute states: "Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief."  § 1030(g).  Fidlar alleges that LPS violated § 1030(a)(5)(A) of the CFAA, which provides that "[w]hoever . . . knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer . . . shall be punished as provided in subsection (c) of this section."[6]

LPS moves to dismiss Fidlar's CFAA claim on two grounds: first, that Fidlar did not properly allege damage or loss as defined by the statute, and second, that Fidlar did not allege that LPS intentionally caused such damage, as required by § 1030(a)(5)(A).

**1.  Damage or Loss Under the CFAA**

Damage is a defined term under the CFAA, and is relevant to Fidlar's claims for two reasons: first, because any civil claim under the statute must allege damage or loss, *see* § 1030(g), and second, because the specific section that Fidlar invokes (§ 1030(a)(5)(A)) requires damage to a protected computer.  The CFAA defines damage as "impairment to the integrity or availability of data, a program, a system, or information."  § 1030(e)(8).  The integrity of a program is of particular import in this case, as Fidlar's CFAA claim is based (at least in part) on

---

[6] The CFAA also limits civil claims to conduct involving one of the factors set forth in subclauses (I)–(V) of subsection (c)(4)(A)(i).  § 1030(g).  LPS's alleged violations fall under (I), which involves loss to one or more persons during any one-year period aggregating at least $5,000 in value.

its opinion that LPS's actions compromised the integrity of Laredo.[7]   In its Complaint, Fidlar presents detailed facts to show that LPS's web harvesting activities impaired the integrity of the Laredo program by allowing LPS to bypass various user controls and use Laredo in a manner not intended by Fidlar.  *See* Compl. at 5–7, ECF No. 31-1.  Under the plain language of the statute, this is sufficient to allege "damage".

Fidlar also properly alleged loss under the CFAA.  As an initial matter, while § 1030(g) requires only a showing of damage *or* loss for all civil CFAA claims, that section also requires that Fidlar's allegations fall within one of the subclauses of § 1030(c)(4)(A)(i)(I)–(V).  Of those subclauses, only (I) is relevant here, which requires "loss to one or more persons during any one-year period . . . aggregating at least $5,000 in value."  As such, loss is a prerequisite to Fidlar's CFAA claim.  The CFAA defines loss as:

> Any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of the interruption of service.

§ 1030(e)(11).  In spite of this relatively straightforward definition of "loss," district courts have interpreted the term in a myriad of ways; those courts' varied approaches are summed up nicely in *TriTeq Lock & Sec. LLC v. Innovative Secured Solutions, LLC*, No. 10 CV 1304, 2012 WL 394229, at *6–7 (N.D. Ill. Feb. 1, 2012).  The common trend is to define loss as either (1) the cost of investigating or repairing a computer or computer system following a violation that

---

[7] Under the CFAA an individual may also cause damage to data or information.                                   § 1030(e)(8).  Some courts have held that data is damaged *only* when destroyed or deleted, but not when copied.  *See, e.g., Del Monte Fresh Produce, N.A. v. Chiquita Brands Intern. Inc.*, 616 F.Supp.2d 805, 810 (N.D. Ill. 2009).  LPS therefore claims that it did not "damage" data because it only copied the information contained in public records, but did not destroy or delete them. But Fidlar has also alleged damage in the sense of impairment to the integrity of a program, which the statute's definition of damage expressly contemplates, thus making it unnecessary for the Court to determine whether Fidlar properly alleged that LPS also damaged data.

caused damage to a computer or computer system, or (2) the cost incurred because the computer's service was interrupted.  *See id.* (collecting authority).  In other words, a plaintiff's claimed loss under the CFAA must involve, at its heart, either damage or an interruption of service.  *Id.* at *7; *but see Farmers Ins. Exchange v. Auto Club Group*, 823 F.Supp.2d 847, 854 (N.D. Ill. 2011) ("Based on the plain language of the CFAA, this court finds that a plaintiff can satisfy the CFAA's definition of loss by alleging costs reasonably incurred in responding to an alleged CFAA offense, even if the alleged offense is found to have caused no damage as defined by the CFAA.").

The problem with the common interpretation of the statute, though, is that it ignores the opening clause of § 1030(e)(11), which broadly defines loss as *any* reasonable cost to any victim.  *See 1st Rate Mortg. Corp. v. Vision Mortg. Servs. Corp.*, No. 09-C-471, 2011 WL 666088, at *1–3 (E.D. Wis. Feb. 15, 2011).  The statute then sets out two examples of loss that fall under that umbrella, but, as indicated by the word "including," these examples are nonexclusive.  As such, the statute provides two ways a victim could experience loss, but these cannot be the only ways, otherwise the opening clause ("any reasonable cost") would be meaningless.  In any event, this point is merely an academic one, since Fidlar has sufficiently pleaded loss under even the more conservative reading of the statute discussed above.

In its Complaint, Fidlar states that, as a result of LPS's web harvesting, "Fidlar has been forced to take actions to prevent further interruptions in service to its clients and customers, the value of which exceeds $5,000."  Compl. at 11, ECF No. 31-1.  Fidlar also explains that, "[t]o date, Fidlar has incurred economic damages in excess of $80,000 in attempting to determine the extent of Defendant's fraudulent invasion of its computers and computer servers, and those damages are ongoing and increasing."  *Id.* at 13.  In other words, Fidlar claims that it expended

resources in order to respond to LPS's web harvesting activities, conduct a damage assessment, and restore Laredo to its prior condition. The factual allegations presented by Fidlar thus fall squarely within the statute's first nonexclusive example of "loss." Fidlar has also sufficiently alleged that this investigation and repair followed a violation that caused damage, for reasons explained above, thus satisfying the courts that adopt a narrower reading of the statute. *See TriTeq*, 2012 WL 394229, at *6–7 (stating that when plaintiff's loss arises from the costs of investigating or repairing a computer or computer system, that investigation and repair must follow damage). Taking the facts in the Complaint as true, Fidlar has pleaded a plausible claim for loss.

## 2. Intentional Damage

Because Fidlar's CFAA claims arises under § 1030(a)(5)(A), Fidlar must allege that LPS "knowingly cause[d] the transmission of a program, information, code, or command, and as a result of such conduct, intentionally cause[d] damage without authorization, to a protected computer." In its Motion to Dismiss, LPS claims that Fidlar failed to allege that LPS intentionally caused damage. But LPS advances too fine a parsing of Fidlar's allegations, especially at this stage of litigation. In its Complaint, Fidlar alleges that LPS's development and use of a web harvester program constituted "intentional unauthorized use of Fidlar's products," and that as a result of that intentional unauthorized use, Fidlar was damaged in excess of $5,000. Compl. at 12, ECF No. 31-1. (As discussed above, Fidlar's allegations of damage are plausible.) Fidlar's Complaint, on its face, claims that LPS undertook intentional actions that caused damage to Fidlar. This is sufficient for the Court to draw the reasonable inference that LPS "intentionally caused damage" under the CFAA.

For these reasons, the Court denies LPS's Motion to Dismiss Count I of Fidlar's

Complaint.  The Court also notes, as others have, that a CFAA plaintiff need only meet the notice requirements of Rule 8(a)(2) rather than the heightened pleading standard of Rule 9(b). *See Patrick Patterson Custom Homes, Inc. v. Bach*, 586 F. Supp. 2d 1026, 1031 (N.D. Ill. 2008). Because Fidlar's Complaint has provided enough detail to give LPS fair notice of what Fidlar's CFAA claim is and the grounds upon which it rests, Fidlar's CFAA claim stands.

### B.  The Illinois Computer Crime Prevention Law

Count II of Fidlar's Complaint alleges that LPS violated Illinois' Computer Crime Prevention Law, 720 Ill. Comp. Stat. 5/17-51 (2011).  Like the CFAA, the Computer Crime Prevention Law ("CCPL") imposes criminal liability for computer fraud and tampering in addition to creating a private right of action.  Section (c) of the statute states: "Whoever suffers loss by reason of a violation of subdivision (a)(4) of this Section may, in a civil action against the violator, obtain appropriate relief."  Subdivision (a)(4) in turn provides:

> (a) A person commits computer tampering when he or she knowingly and without the authorization of a computer's owner or in excess of the authority granted to him or her:
> . . .
>
> (4) Inserts or attempts to insert a program into a computer or computer program knowing or having reason to know that such program contains information or commands that will or may:
>
> > (A) damage or destroy that computer, or any other computer subsequently accessing or being accessed by that computer;
> >
> > (B) alter, delete, or remove a computer program or data from that computer, or any other computer program or data in a computer subsequently accessing or being accessed by that computer; or
> >
> > (C) cause loss to the users of that computer or the users of a computer which accesses or which is accessed by such program[.]

720 Ill. Comp. Stat. 5/17-51(a)(4).  Accordingly, it is critical to any civil claim under the CCPL that the defendant insert or attempt to insert a program into a computer *or* computer program.

18

*See Farmers Ins. Exchange v. Auto Club Group*, 823 F.Supp.2d 847, 859 (N.D. Ill. 2011). Fidlar's allegations support a reasonable inference that LPS engaged in such conduct, since Fidlar claims that LPS's use of a web harvester allowed it to bypass the Laredo user interface and directly access Fidlar's servers and server software.   In its Complaint, Fidlar alleges that "LPS created one or more computer programs, the sole purpose of which [was] to mimic the interface between Fidlar's user-interface software and Fidlar's server software. . . . The web-harvesting program did not use the Laredo user-interface but instead, connected via the Internet, directly to Fidlar's server software."   Compl. at 5–6, ECF No. 31-1.   These allegations are sufficient for the Court to infer that LPS inserted or attempted to insert a program into another computer or computer program, and as such they support a plausible claim for relief under the CCPL.   Accordingly, LPS's Motion to Dismiss Count II of Fidlar's Complaint is denied.

### C. Trespass to Chattels

Finally, LPS moves to dismiss Count III of Fidlar's Complaint, which alleges that LPS's conduct constituted trespass to chattels under the common law.   Trespass to chattels, an oft-forgotten common law tort usually familiar only to first-year law students, provides redress for unauthorized use of or intermeddling with another's physical property.   *See* Restatement (Second) of Torts § 217 (1965).   "Trespass" is defined as a tangible interference with property that is intentional, unauthorized, and substantial; a defendant "intermeddles" with a chattel by intentionally bringing about a physical contact with it that causes harm.   *Id.* at §§ 217–18. Accordingly, monetary damages are limited to the actual harm or damage suffered, not for negligible harms caused by intermeddling.   *Id.* at § 218 cmt. e.   Unlike the tort of trespass to land, trespass to chattels does not protect the inviolability of the chattel, but instead only protects against harm to the physical quality of the chattel or any substantial deprivation of the

possessor's use of it.  *Id.*

Trespass to chattels has experienced a sort of revival as of late in the cyberspace context. *See* Laura Quilter, *The Continuing Expansion of Cyberspace Trespass to Chattels*, 17 Berkeley Tech. L.J. 421, 421 (2002); Richard Warner, *Border Disputes: Trespass to Chattels on the Internet*, 47 Vill. L. Rev. 117, 118–20 (2002).  Beginning in the mid-1990s, courts began applying the tort to actions undertaken over the Internet, first in the context of hacking into the equipment of a long-distance telephone provider.  *See Thrifty-Tel, Inc. v. Bezenek*, 54 Cal. Rptr. 2d 468, 470–71 (Ct. App. 1996).  Trespass to chattels soon became used as a means of combatting spam emails, *see, e.g.*, *CompuServe, Inc. v. Cyber Promotions, Inc.*, 962 F. Supp. 1015, 1020–23 (S.D. Ohio 1997), as well as "spiders" that conduct automated searches of websites, *see eBay, Inc. v. Bidder's Edge*, 100 F.Supp.2d 1058 (N.D. Cal. 2000).  But in spite of the tort's adaptability at remedying modern nuisances, courts applying the tort to the Internet context have relied on assumptions that have since received significant criticism.  *See* Dan L. Burk, *The Trouble with Trespass*, 4 J. Small & Emerging Bus. L. 27, 27 (2000) (stating courts have "mangled" the traditional elements of trespass to chattels in applying the tort to disputes over computer networks).  First, defining chattels to include not only computers but electronic networks and computer processing power is at odds with traditional understanding of the term, which is limited to material items or living property.  *See* Quilter, *supra*, at 437–38; Warner, *supra*, at 120 ("Applying the doctrine to the Internet carries the danger that courts will invoke a traditional, and possibly inappropriate, property right in ways that interfere with the Internet's life-blood—low-cost communication and unimpeded access to information.").  Additionally, by recognizing electronic signals as a trespass, courts have ignored the requirement of a physical trespass and thereby blurred the distinction between trespass to chattels and trespass to land.  *Id.*

at 439.  Finally, courts have moved away from traditional definitions of "harm" (i.e. physical harm or deprivation of use) to consider nebulous and speculative harms like loss of corporate goodwill and time wasted by employees reading spam email.  *Id.* at 439–40.

With that in mind, the Court turns to the present case.  Fidlar makes several claims as to how LPS's actions constituted trespass to chattels.  First, Fidlar claims that by circumventing Laredo's user-interface and directly accessing Fidlar's servers, LPS engaged in theft of data located thereon.  Compl. at 14, ECF No. 31-1.  This is insufficient to allege trespass to chattels, since that data (1) was not tangible property and therefore not chattel, and (2) was not owned by Fidlar, since it consisted of public records.  *See* W. Page Keeton, Keeton & Prosser on Torts § 14, at 85–86 (5th ed. 1984).  Fidlar also alleges that LPS's use of a web harvester prevented Laredo from recording information such as the time LPS spent using Laredo and the records LPS searched for; according to Fidlar, that information was its chattel to which it was entitled.  *See* Resp. to Mot. to Dismiss at 10, ECF No. 38.  This argument fails as well, as that information was not physical property.

There is tangible property implicated in this case, though: Fidlar's servers, located in Rock Island County, Illinois.  According to Fidlar, when LPS bypassed Laredo's user-interface and directly queried Fidlar's servers with its web-harvesting program, LPS was able to conduct searches at a higher rate and volume than would otherwise be possible.  Compl. at 10, ECF No. 31-1.  Fidlar claims that this constituted a "threat" to the proper functioning of Fidlar's servers.  *Id.* at 11.  Presumably, the inference is that LPS's ability to conduct faster searches impaired the "condition, quality, or value" or Fidlar's computer servers.  *See* Restatement (Second) of Torts § 218 (1965).  While Fidlar's allegations are not dripping with detail, the Court does not think they are so "sketchy or implausible" that they fail to give LPS adequate notice of the claims against it.

21

*Cf. Sotelo v. DirectRevenue, LLC*, 384 F.Supp.2d 1219, 1230–31 (N.D. Ill. 2005) (denying motion to dismiss claim of trespass to chattels related to defendant's installation of spyware on plaintiff's computer, where plaintiff alleged the spyware obscured web pages, destroyed other software on computer, slowed down computer, used Internet bandwith, depleted memory, utilized pixels on monitors, required computer's energy, and incurred increased Internet-use charges).   The Court therefore finds the Fidlar has pleaded sufficient facts for the Court to draw the reasonable inference that LPS's activities constituted trespass to chattels.   Accordingly, the Court denies LPS's motion to dismiss Count III of Fidlar's Complaint.

## II. LPS's Motions for Equitable Relief

The Court now turns to LPS's motions for equitable relief, which arise out of LPS's Counterclaim.   In its Counterclaim, LPS alleges that Fidlar, by telling the counties that LPS's web harvesting constituted "unauthorized access," "hacking," "fraud," and "illegal conduct" that "compromised" the counties' records, effectively induced the counties into terminating LPS's Laredo access and thereby tortiously interfered with LPS's contracts and business expectancy. *See* ECF No. 19, at 13–17.   Accordingly, LPS's Motion for a Temporary Restraining Order and Preliminary Injunction requested that the Court prohibit Fidlar from making further deprecating statements to the counties regarding LPS's mode of access to Laredo, and order Fidlar to ask the counties to restore LPS's access to Laredo pending resolution of the parties' claims.   ECF No. 9, at 2.   At a hearing on April 15, 2013, the Court denied Fidlar's request for a TRO, and set the matter for further proceedings regarding the preliminary injunction.   After that, LPS also filed an Emergency Motion for a Temporary Restraining Order to prevent Fidlar from releasing a new version of Laredo that would block web harvesting, on the grounds that implementation of the new software would violate Illinois statute.   ECF No. 15, at 2.   At the time of the hearing held on

May 17, 2013, regarding LPS's outstanding motions, the Laredo launch had already occurred in approximately 80 counties, about 40 of which still have contracts with LPS. At that hearing, LPS redefined the injunctive relief it is now seeking. LPS requests that the Court do the following: (1) prohibit Fidlar from further impugning LPS to the counties; (2) enter findings (to be sent to the counties) that Fidlar misled the counties and provided false information; (3) order Fidlar to retract the Laredo upgrade; and (4) order Fidlar to communicate to the counties that Illinois statute prohibits the counties from using Laredo to force users to print documents rather than download them.

In essence, LPS desires two things: it wants Fidlar to recant its statements to the counties about LPS's activities, and it wants the Laredo upgrade retracted so that it can continue web harvesting in all of the counties at issue. The first request is fully addressed below. As to LPS's claim that the counties must allow LPS to web harvest (i.e. that they are prohibited from charging to download documents), however, the Court lacks jurisdiction over the counties and accordingly declines to rule on that question.

### A. The Counties Are Not Parties to the Lawsuit, and May Not Be Enjoined from Upgrading Laredo or Charging Print Fees

On April 22, 2013, Fidlar disseminated an email to all relevant counties announcing that it would be releasing a new version of Laredo that would prevent all current known methods of web harvesting. *See* ECF No. 15, Ex. A. The Laredo upgrade was made available to all counties currently using the program, and it required the counties to "opt in" by giving Fidlar their express permission to install the upgrade. *Id.* LPS now claims that the Illinois counties that installed the upgrade violated Illinois' Freedom of Information Act and Counties Code, which LPS believes require the counties to provide electronic access to their public records at no charge. *See* ECF No. 15, at 4. In other words, LPS argues not just that web harvesting is legal,

but that the unfettered public access it makes possible is *required* of the counties under state law and pursuant to the contracts between LPS and the counties.  Similarly, LPS's Counterclaim seeks a declaratory judgment from the Court that the Laredo program fails to comply with Illinois and Wisconsin statutes because it requires users to pay to print documents.  *See* ECF No. 19, at 17–20.

The fundamental problem with LPS's request to retract the Laredo upgrade, though, is that it seeks to enjoin entities—namely, the counties—who are not parties to this lawsuit.  "It is a principle of general application in Anglo-American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process."  *Nat'l Spiritual Assembly of Baha'is of the United States of America Under the Hereditary Guardianship, Inc. v. Nat'l Spiritual Assembly of the Baha'is of the United States of America, Inc.*, 628 F.3d 837, 847 (7th Cir. 2010) (citations and quotes omitted).  Accordingly, under Federal Rule of Civil Procedure 65(d)(2), an order granting an injunction only binds (A) the parties, (B) the parties' officers, agents, servants, employees, and attorneys, and (C) other persons who are in active concert or participation with anyone described in (A) or (B).  The counties are not parties, nor are they agents of Fidlar, and as such they do not fall under (A) or (B).  The only question is whether they are "in active concert or participation" with Fidlar.  It is LPS's burden to prove that they are, *see Blockowicz v. Williams*, 630 F.3d 563, 567 (7th Cir. 2010), but for the following reasons LPS has not met its burden.

The purpose of Rule 65(d)(2) is to "ensure that defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding."  *Blockowicz*, 630 F.3d at 567 (citations and quotes omitted).  Accordingly, a person is in "active concert or participation" with an enjoined party, and thus bound by the

injunction, if he "aids or abets an enjoined party in violating the injunction." *Id.*  Here, LPS claims that Fidlar aided and abetted the counties in violating Illinois' FOIA law because Fidlar implemented the Laredo upgrade on the counties' behalf.  *See* ECF No. 15, at 4–5.  But LPS has it backwards: the nonparty (the counties) must aid and abet the named party (Fidlar) in order to fall under Rule 65(d)(2)(C), not the other way around.  And LPS has put forth no evidence showing that the counties aided or abetted Fidlar in violating state statute.  To the contrary, it is undisputed that the decisions to charge for printing documents, to terminate LPS's Laredo access, and to install the Laredo upgrade were ultimately made by the counties.  To enjoin the counties on an "aiding or abetting" theory would violate the fundamental principle that courts may not grant an injunction "so broad as to make punishable the conduct of persons who act independently and whose rights have not been adjudged according to law."  *Regal Knitwear Co. v. Nat'l Labor Relations Bd.*, 324 U.S. 9, 13 (1945).

There is another way that an injunction may be enforced against a nonparty: if the nonparty is in "privity" with an enjoined party.  *Nat'l Spiritual Assembly of Baha'is*, 628 F.3d at 848–49.  Entities may be in privity with one another if they have a sufficiently close identity of interests that they can be "legally identified" together.  *Id.* at 849.  When privity is invoked as a basis for binding a nonparty to an injunction, it is "restricted to persons so identified in interest with those named in the decree that it would be reasonable to conclude that their rights and interests have been represented and adjudicated in the original injunction proceeding."  *Id.* (quoting 11A Charles Alan Wright et al., Federal Practice and Procedure § 2956, at 340–41 (2d ed. 1995)).  Here, there is simply no evidence that the counties and Fidlar enjoy such a close identity of interests that they could be said to be in privity with one another.  This is especially true in light of the striking constitutional limitations on privity, such as the due process

requirement that each person has a right to his day in court.  *See Tice v. Am. Airlines, Inc.*, 162 F.3d 966, 971 (7th Cir. 1998) (in context of preclusion, "serious due process problems would arise if the earlier nonparty were barred from her own day in court"); *Richards v. Jefferson Cnty.*, 517 U.S. 793, 798 (1996) ("[A] judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings.").

For these reasons, the Court lacks jurisdiction over the counties.  While LPS's motions raise serious concerns over the counties' requirement that users pay to access public records, *see* Leitheiser Dep. at 3, that issue is not properly before the Court to decide.  The due process implications of enjoining the counties are particularly alarming given that the Court would be required to apply non-forum state law to counties located in multiple jurisdictions.  The Court therefore denies LPS's motion to order the counties to uninstall the Laredo upgrade or to reinstate LPS's Laredo access.  The Court likewise declines issuing judgment on whether the counties' use of Laredo to charge users to print documents violates state statute.  The Court now turns to LPS's request that the Court (1) prohibit Fidlar from further impugning LPS to the counties, (2) and enter findings (to be sent to the counties) that Fidlar misled the counties and provided false information.

### B.  Standard for Granting a Preliminary Injunction

The typical purpose of a preliminary injunction is to preserve the status quo pending resolution of the parties' claims.  *See* 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Fed. Prac. and Proc. Civ. § 2948 (2d ed.).  Courts should not take the issuance of a preliminary injunction lightly, as it is an "extraordinary remedy" that is granted only where the movant, by a clear showing, carries the burden of persuasion.  *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999) (quoting id.).  The party seeking a preliminary injunction must first

demonstrate that (1) its case has some likelihood of success on the merits, and (2) that no adequate remedy at law exists and the movant will suffer irreparable harm if the injunction is not granted. *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992). If these conditions are satisfied, then the Court must balance the irreparable harm that the nonmovant would suffer if the injunction is granted against such harm the moving party would suffer if relief is denied. *Id.* The Court must also consider the public interest, i.e. the consequences to non-parties of granting or denying the injunction. *Id.*; *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433 (7th Cir. 1986). The Court then balances all of these factors, sitting as would a chancellor of equity. *Abbott*, 971 F.2d at 12. This balancing involves a sliding scale approach: the greater the movant's chance of succeeding on the merits, the less strong a showing it must make that the balance of harms is in its favor. *Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 314 (7th Cir. 1994).

### 1. LPS's Likelihood of Success on the Merits

Equity jurisdiction exists only to remedy legal wrongs, and without some showing of a probable right to relief there is no basis for invoking it. *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984). LPS must therefore show a likelihood of succeeding on its claims of tortious interference with contract and with business expectancy. This threshold is low, though, as LPS need only demonstrate that its chances are "better than negligible." *Boucher v. Sch. Bd. of Greenfield*, 134 F.3d 821, 824 (7th Cir. 2008).

Tortious interference with contract and tortious interference with business expectancy[8] are related torts that recognize that one's business relationships constitute a property interest and

---

[8] The tort is also commonly referred to as interference with prospective economic advantage or prospective contractual relations. *See Delloma v. Consolidation Coal Co.*, 966 F.2d 168, 170–71 (7th Cir. 1993).

are entitled to protection from unjustified tampering by another. *Belden Corp. v. InterNorth, Inc.*, 413 N.E.2d 98, 101 (Ill. App. Ct. 1980) (citing *City of Rock Falls v. Chicago Title & Trust Co.*, 300 N.E.2d 331, 333 (Ill. App. Ct. 1973)). "Both causes of action imply a balancing of societal values: an individual has a general duty not to interfere in the business affairs of another, but he may be privileged to interfere, depending on his purpose and methods, when the interference takes a socially sanctioned form[.]" *Id.* Of the two torts, tortious interference with contract affords more protection, because "the sacrosanct contractual relation takes precedence over the conflicting rights of any presumptive interferor[.]" *Id.* (citing Prosser, Torts § 129, at 945 (4th ed. 1971)).

The elements of a cause of action for tortious interference with contractual relations are: (1) the existence of a valid and enforceable contract between the plaintiff and third person; (2) the defendant's knowledge of the existing contract; (3) the defendant's intentional and unjustified inducement of the third person to breach the contract;[9] (4) the subsequent breach by the third person due to the defendant's wrongful conduct; and (5) resulting damages incurred by the plaintiff. *Scholwin v. Johnson*, 498 N.E.2d 249, 255 (Ill. App. Ct. 1986). The elements of tortious interference with business expectancy are similar, but less stringent; it requires that the plaintiff reasonably expect to enter into a valid business relationship, that the defendant know about this expectancy and purposefully interfere with it, and that the plaintiff suffer damages as a result. *Soderland Bros., Inc. v. Carrier Corp.*, 663 N.E.2d 1, 7–8 (Ill. App. Ct. 1995). Here, Fidlar does not dispute that LPS can make out a *prima facie* case under both causes of action, but rather argues that its communications to the counties were privileged and therefore non-

---

[9]    Some cases state that the defendant's inducement must be "malicious," but "malice" in this context only means without just cause, not ill will or hostility. *Scholwin v. Johnson*, 498 N.E.2d 249, 255 (Ill. App. Ct. 1986)

actionable.  The Court will therefore directly address Fidlar's claimed privileges; if Fidlar can show that its statements were privileged, then it is LPS's burden to plead and prove that Fidlar's conduct was unjustified or malicious.  *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 676–77 (Ill. 1989).

### Privilege for Giving Truthful Information, or Opinion

Truthful statements are privileged and cannot form the basis of a claim for tortious interference.  *See* Restatement (Second) of Torts § 772 (1979) (giving truthful information to another is "clearly not" improper, and therefore does not constitute interference with contract); *Delloma v. Consolidation Coal Co.*, 966 F.3d 168, 172 (7th Cir. 1993) (examining Illinois law and concluding that a truthful statement cannot form the basis for an action for tortious interference with business expectancy).  This is the case even if the facts are "marshaled in such a way that they speak for themselves and the person to whom the information is given immediately recognizes them as a reason for breaking his contract or refusing to deal with another."  Restatement (Second) of Torts § 772 cmt. b.  Additionally, matters of fact are distinguishable from expressions of opinion, and the latter cannot form the basis of an action for tortious interference.  *Soderland Bros.*, 663 N.E.2d at 10–11 (citing Prosser & Keaton on Torts § 128, at 968).  Accordingly, two inquiries are at play here: first, whether Fidlar's communications to the counties constituted statements of fact or opinion; and second, if they were statements of fact, whether they were true or false.

Distinguishing between fact and opinion is a sticky wicket, and case authority dealing with tortious interference provides little insight.  In the context of defamation, the dividing line between fact and opinion is better delineated.  If the speaker expresses a subjective view, an interpretation, a theory, or conjecture, rather than claiming to be in possession of objectively

verifiable facts, the statement is opinion. *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993) (citing authority); *Wynne v. Loyola Univ. of Chicago*, 741 N.E.2d 669, 676 (Ill. App. Ct. 2000) ("[T]he vaguer and more generalized the opinion, the more likely the opinion is nonactionable[.]").   On the whole, opinions are interpreted narrowly, and are protected from defamation suit only when they cannot be reasonably interpreted as stating actual facts about the plaintiff. *Bryson v. News America Publ'ns, Inc.*, 672 N.E.2d 1207, 1220 (Ill. 1996).   In making its determination, the court should consider all the circumstances of a particular case, and ask whether the relying party may have justifiably relied on the statement as though it were a statement of fact. *See LaScola v. U.S. Sprint Commc'ns*, 946 F.2d 559, 568 (7th Cir. 1991) (evaluating in context of fraudulent misrepresentation); *see also Chicago Conservation Ctr. v. Frey*, 40 F. App'x 251, 256 (7th Cir. 2002) (explaining that a speaker's remarks cannot be divorced from the context in which they occurred).   Finally, legal accusations have been found to be actionable statements of fact, because they are capable of being objectively verified by a jury. *See Republic Tobacco Co. v. North Atl. Trading Co., Inc.*, 381 F.3d 717, 729 (7th Cir. 2004) (concluding that defendant's statements that plaintiff had violated its patent or trademark were actionable defamation because such statements could be easily evaluated by a jury, and were therefore statements of fact).

When viewed in this light, Fidlar's communications to the counties more closely resemble statements of fact than opinion.   Fidlar does not dispute that it told the counties that:

- LPS had gained "improper" access, had "breached" Fidlar's system, and had engaged in "unauthorized use" of Laredo.

- LPS had violated several state and federal laws by "hacking" into Fidlar's servers.

- LPS's actions constituted "fraud," and were "illegal."

- LPS had gained unauthorized access to the counties' land records data and images.

- The counties' records had been "compromised."

- The counties had sufficient reason to terminate LPS's Laredo contract without notice.

Taken in context, these statements were presented as objectively verifiable facts, not mere conjecture or theory. As opposed to vague or generalized opinions, Fidlar's communications to the counties were detailed and authoritative accounts of past events. *See Republic Tobacco*, 381 F.3d at 729 ("[T]he phrasing of these statements in the past tense makes them all the easier to separate out from statements expressing the speaker's subjective view."). Fidlar's audit report in particular was understood by some counties to be a definitive documentation of LPS's "illegal" and "unauthorized" conduct. *See* Leitheiser Dep. at 38; Voigt Dep. at 17 (confirming that Fidlar's "evidence" assisted decision to terminate LPS's account). Also, when Fidlar told the counties that LPS's access to Laredo was "unauthorized," it did not explain what that term meant. *See* Cochran-Wilson Dep. at 9.

Accordingly, the counties' reliance on the statements as if they were facts was reasonable. This is especially true in light of the trust the counties put in Fidlar to safeguard their interests. It is evident that many of the county recorders and county clerks who hire Fidlar to make their counties' records public rely on Fidlar for its technical expertise and advice. *See, e.g.,* Leitheiser Dep. at 11. When Fidlar told the counties that LPS's web harvesting was "illegal," "unauthorized" access, some of the counties took this as encouragement to shut off LPS. *See id.* at 38–39 ("Fidlar gave me, I feel, guidance to shut off LPS until this was solved.").

Similarly, some counties took Fidlar's communications as documentary evidence that supported their decision to terminate LPS's Laredo accounts.  *See* Kalkbrenner Dep. at 16.

The Court is therefore satisfied that, when viewed in light of the facts and circumstances of the case, Fidlar's communications to the counties were, on the whole, statements of fact.  The next question is therefore whether those statements were truthful.  With respect to Fidlar's description of LPS's use of a web harvester program to capture the data from images of public records, there is no doubt that such statements were truthful, as LPS is quite open about the fact that it uses web harvesters.  But as to Fidlar's more general characterizations of LPS's behavior as "illegal," "unauthorized," "fraud," and "hacking," among other things, the Court cannot say at this time whether such statements are true or false, because Fidlar's underlying claims have not yet been submitted to a jury.  As this Circuit noted in *Republic Tobacco Co. v. North Atlantic Trading Co., Inc.*, the way to verify the truthfulness of legal accusations is to allow a jury to evaluate them.  381 F.3d 717, 729 (7th Circuit 2004).  But while the Court cannot assess with certainty the truthfulness of Fidlar's claims at this time, such a determination is not necessary at the preliminary injunction stage.  LPS need only show that its twin claims of tortious interference have a better-than-negligible chance of success, and the Court thinks that the evidence put forth by LPS sufficiently shows that Fidlar's communications were not privileged as truthful statements as fact or opinion.

### Privilege for Giving Honest Advice

There is another privilege to tortious interference with contract and with business expectancy that the Court must address, that being the privilege for giving honest advice (often referred to as the consultant's privilege).  The purpose of the privilege is to permit consultants or advisors to offer good-faith advice to a client without fear of liability should the client act on that

advice to the harm of a third person.  *J.D. Edwards & Co. v. Podany*, 168 F.3d 1020, 1022 (7th Cir. 1999).  It is immaterial that the giver of the advice also profit by the advice, or that he dislikes the third person or takes pleasure in the harm caused to him by the advice.  *Id.*; *In re Estate of Albergo*, 656 N.E.2d 97, 104 (Ill. App. Ct. 1995).  The only requirements for the privilege to apply are (1) that the advice be requested, (2) that the advice given be within the scope of the request, and (3) that the advice be honest.  Restatement (Second) of Torts § 772 cmt. c.

　　　As to the first and second elements, which essentially ask whether the advice given was within the scope of the consultant's engagement, it is evident that not every county specifically asked Fidlar to investigate LPS's activities to ensure that users could not download documents.  While some counties did, *see* Kalkbrenner Dep. at 10, it appears that many counties simply retained Fidlar to make their records available electronically.  But to hold that Fidlar's communications fall beyond the scope of the counties' requests—even if the request was only to make records available electronically—would draw an artificial distinction that cuts against the purpose of the privilege.  Fidlar's communications were the sort of information that the counties surely desired.  This Circuit noted in *J.D. Edwards & Co. v. Podany*, 168 F.3d at 1024, that the privilege may apply so long as the consultant competently shares information that the client would want, even if the advice was not literally requested:

> [I]f a consultant discovers a problem that is outside the strict terms of his engagement but within the range of his competence, the client would want him to bring the problem to the client's attention without fear of being sued should the solution involve the termination of a contract.  So likely is this to be what the client would want that we can assume . . . that it is an implied term of the engagement.

Such is the case here.  It was surely within Fidlar's competence to comment on LPS's web harvesting activities.  And one can assume that the counties wanted to be made aware of LPS's

behavior, as particularly evidenced by the fact that of the approximately 80 counties that Fidlar notified, about half terminated LPS's Laredo account.  For these reasons, the Court is satisfied that Fidlar's advice to the counties was either expressly or impliedly within the scope of their requests.

As to whether Fidlar's advice was "honest," a consultant does not give honest advice if he "uses his engagement to hurt other people *exclusively* for his own benefit (or out of dislike of his victim) rather than for the benefit of his client[.]"  *Podany*, 168 F.3d at 1023 (emphasis added).  In other words, a consultant's advice is honest so long as he intends, at least in part, to benefit his client.   While Fidlar certainly may have had competing motivations for recommending that the counties terminate LPS's Laredo accounts, there is no evidence that its advice was given with *no* intention to benefit the counties.   Therefore, Fidlar's advice was "honest" for purposes of the privilege.

For these reasons, and based on the facts presently before the Court, the consultant's privilege presents a significant obstacle to LPS's claims of tortious interference.   LPS can overcome the privilege only by demonstrating that Fidlar's actions were unjustified or done with actual malice, an inquiry which substantially resembles the question of whether Fidlar's advice was honest.  *HPI Health Care Servs.*, 545 N.E.2d at 677.   While LPS claims that Fidlar deceitfully painted LPS as a bad actor in order to satisfy its customer base and shield itself from blame, it is equally apparent that Fidlar believes that both it and the counties were wronged by LPS's behavior.   As such, Fidlar's actions were not unjustified.   It is immaterial that Fidlar profited from its advice, or that it took pleasure in the harm caused to LPS by the advice.  *See Albergo*, 656 N.E.2d at 104.   Likewise, as discussed above, no evidence suggests that Fidlar's statements were made with actual malice, i.e. made with a desire to harm the plaintiff which was

unrelated to "a desire to protect the acting party's rights [or . . .] the defense of a recognized property or social interest." *Arlington Heights Nat. Bank v. Arlington Heights Fed. Sav. & Loan Ass'n*, 229 N.E.2d 514, 518 (Ill. 1967). Fidlar's communications and advice to the counties were, in light of the evidence before the Court, very much borne out of its desire to protect itself and the counties.

Based on this record, the Court finds that Fidlar's statements were privileged as "honest advice." Keeping in mind the low standard for demonstrating a likelihood of success on the merits, though, the Court finds it appropriate to address another relevant privilege that shields Fidlar's statements from liability.

### *Noerr-Pennington* Doctrine

Fidlar further claims that its communications to the counties were privileged under the *Noerr-Pennington* doctrine. That doctrine derives from two Supreme Court cases holding that the First Amendment Petition Clause immunizes from antitrust liability acts of petitioning the government. *See E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers of America v. Pennington*, 381 U.S. 657, 670 (1965). The First Amendment provides: "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I. *Noerr-Pennington* thus extends immunity under the antitrust laws to "businesses and other associations when they join together to petition legislative bodies, administrative agencies, or courts for action that may have anticompetitive effects." *Mercatus Group, LLC v. Lake Forest Hosp.*, 641 F.3d 834, 841 (7th Cir. 2011). The purpose of *Noerr-Pennington* is essentially to "protect private parties when they petition the government for laws or interpretations of its existing laws even though those private parties are pursuing their goals with anticompetitive intent." *Video*

*Int'l Prod., Inc. v. Warner–Amex Cable Commc'ns, Inc.*, 858 F.2d 1075, 1084 (5th Cir. 1988). Importantly for this case, the doctrine has been applied broadly outside the realm of antitrust, and some courts have extended it to provide immunity for state law tort claims of tortious interference with contract and with business expectancy. *See Theme Promotions, Inc. v. News America Mktg. FSI*, 546 F.3d 991, 1006–1007 (9th Cir. 2008) (applying doctrine to claim for tortious interference with prospective economic advantage under California law); *Video Int'l Prod.*, 858 F.2d at 1084 (applying doctrine to state law claim for tortious interference with contract); *Rubloff Dev. Group, Inc. v. SuperValu, Inc.*, 863 F.Supp.2d 732, 746 (N.D. Ill. 2012) (applying *Noerr-Pennington* to claim of tortious interference with prospective economic advantage under Illinois law).

The question here is whether Fidlar's communications to the counties (which are governmental entities, *see Mercatus Group, LLC v. Lake Forest Hosp.*, 641 F.3d 834, 841 (7th Cir. 2011)), constitute "petitioning" under the First Amendment. First, it is worth noting that relatively few courts and academic commentators have addressed the meaning of the Petition Clause. *See* Carol Rice Andrews, *A Right of Access to Court Under the Petition Clause of the First Amendment: Defining the Right*, 60 Ohio St. L.J. 557, 558 (1999). Second, while "petitioning" once carried a specific meaning inherited from its English origins, *see generally* Gregory A. Mark, *The Vestigal Constitution: The History and Significance of the Right to Petition*, 66 Fordham L. Rev. 2153 (May 1998), it is now more broadly understood to mean most efforts to persuade one's representatives, *see Mercatus*, 641 F.3d at 841–842. Fidlar's actions fall within this meaning. Fidlar's communications with the counties were at least partially made to convince the counties to redress Fidlar's perceived grievances, in that Fidlar's statements were obvious attempts to persuade them to cut off LPS's Laredo access and forestall LPS from using

web harvesting programs to access Laredo.

LPS argues that applying *Noerr-Pennington* in this case to shield Fidlar's communications would effectively void the torts of tortious interference with contract and with business expectancy whenever the government is a party to the contract. But that is not the case, for the right to petition is not absolute. For example, filing a lawsuit is a form of petitioning activity, but baseless litigation is not immunized by the First Amendment right to petition. *McDonald v. Smith*, 472 U.S. 479, 484 (1985) (citations and quotes omitted). In the antitrust context, petitioning done with the sole purpose of disadvantaging a competitor is not protected. *See City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 380 (1991). Petitions to the President that contain intentional and reckless falsehoods are not constitutionally protected and may be actionable libel. *McDonald*, 472 U.S. at 484. Therefore, the Court can certainly imagine situations where a petitioning activity could constitute actionable tortious interference: for example, where the petitioning complained of is entirely baseless or done only to hinder a competitor. But such is not the case here. The Court raises the issue only to point out that applying *Noerr-Pennington* to immunize Fidlar's statements in this case would not necessarily protect more egregious examples of tortious interference.

LPS also asserts that Fidlar's statements did not constitute "petitioning" because Fidlar was speaking to its client about matters within the scope of their contract. Not only is it unclear why such a distinction matters, but it makes little sense that one's constitutional right to petition the government is abrogated simply because the government is also one's client. The *Noerr–Pennington* doctrine recognizes that our democratic system of government derives its very vitality from its citizens' ability to advocate for changes in the law. *Mercatus*, 641 F.3d at 841–42. Fidlar's statements to the counties, while certainly detrimental to LPS, were borne out of a

desire to influence publicly-elected officials' execution of their duties.  Accordingly, the Court finds that Fidlar's statements were privileged.

For the reasons set forth above, the Court is not convinced that LPS enjoys a likelihood of success on the merits of its causes of action for tortious interference with contract and with business expectancy.  While the bar for making such a showing is low, it is not nonexistent.  In light of the Court's determination that Fidlar's statements to the counties were almost certainly privileged, LPS's chances of success are not "better than negligible": they are, in fact, negligible. *See Boucher v. School Bd. of Greenfield*, 134 F.3d 821, 824 (7th Cir. 2008).  That said, a district judge asked to decide whether to grant or deny a preliminary injunction must choose the course of action that will minimize the costs of being mistaken.  *Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980).  Even a plaintiff who enjoys a low likelihood of success on the merits could still obtain a preliminary injunction by demonstrating that the balance of relative harms weighs strongly in his favor.  *See Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984); *Am. Hosp.*, 625 F.2d at 1331 ("The required showing of probability of success on the merits varies with the quality and quantum of harm that [the moving party] will suffer from the denial of an injunction[.]") (quotes omitted).   Accordingly, in an abundance of caution, the Court finds it appropriate to address the potential harm to the parties.

## 2.  LPS's Adequate Remedy at Law

A plaintiff seeking a preliminary injunction must show that he has no adequate remedy at law and that he will suffer "irreparable harm" if the injunction does not issue before trial. *Roland*, 749 F.2d at 386.  The relevant inquiry is whether the plaintiff would be made whole by monetary damages should he prevail at trial.  *Id.*  A plaintiff need not show that an award of damages would be "wholly ineffectual," just that it would be "seriously deficient" as a remedy

for the harm suffered.  *Id.* (citing *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970)).   Damages may be deficient if they come too late to save the plaintiff's business, or if the nature of the plaintiff's loss makes damages difficult to calculate.  *Id.*

Here, even if LPS were to ultimately prevail on its claims of tortious interference, it is unlikely that damages would adequately account for the harm suffered.  This is primarily due to the fact that LPS needs up-to-date information to be competitive.  LPS constantly revises and updates its records in order to license them to customers, and when those records become obsolete they are no longer valuable.   Since LPS's Laredo access was terminated in approximately 42 counties, LPS has not updated its public records information, thereby inhibiting LPS's ability to continue providing its services to customers.  (It is true that LPS has not engaged in field collection in those counties, but given the logistical and financial drawbacks of that method of data collection, it seems that LPS would not have updated many records even if it had initiated field collection efforts when its Laredo accounts were terminated.)  Calculating the damages to LPS resulting from this loss of access to public records would be an extremely difficult task.   Moreover, "irreparable harm" for the purposes of granting a preliminary injunction also includes intangible harms like damage to a party's business reputation or loss of goodwill.  *See Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 902 (7th Cir. 2001) (evaluating intangible harms in the context of trademark infringement).  While LPS has not yet lost any customers, there is a substantial risk that LPS's widely-circulated disparagement of LPS is causing serious and irreparable harm to LPS's reputation and business goodwill.  Accordingly, LPS has sufficiently shown that it lacks an adequate remedy at law.

### 3.  Balancing of the Harms

As mentioned above, a judge tasked with ruling on a motion for a preliminary injunction

should choose the course of action that minimizes the costs of being mistaken.  *Am. Hosp.*, 780 F.2d at 593.  To accomplish that end, the court must weigh any irreparable harm to the plaintiff should an injunction not issue against any irreparable harm that the defendant can show he will suffer if the injunction is granted.  *Roland*, 749 F.2d at 387.  LPS seeks injunctive relief prohibiting Fidlar from further impugning LPS to the counties, and essentially requiring that Fidlar tell the counties that its legal characterizations of LPS's behavior were made in haste.  The resulting harm to Fidlar from such an injunction would be the deprivation of its First Amendment freedom, which "unquestionably constitutes irreparable injury."  *Joelner v. Village of Washington Park, Illinois*, 378 F.3d 613, 620 (7th Cir. 2004) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

In balancing the harms to the parties, the Court must also consider the public interest.  This case raises significant concerns related to freedom of access to public records, the integrity of those records, and the methods some counties use to generate revenue.  But because the counties are not parties to this suit, the public interests implicated by LPS's requested injunction are much more limited in scope.  Put simply, the competing public interests involved here are (1) the freedom of consultants to render candid advice free from fear of suit; (2) the freedom to petition local governments; and (3) businesses' ability to maintain revenue and goodwill in the face of litigation.

In considering all of these factors, the Court does not find that the balance of harms sufficiently weighs in LPS's favor to compensate for LPS's negligible likelihood of success on the merits.  While LPS does face irreparable injury to its business and reputation, that injury— when compared with potential harm to Fidlar, and the public interest—is not so great as to make up for the fact that Fidlar's communications to the counties were privileged.  Courts tasked with

ruling on preliminary injunctions must consider not just the consequences, but the probabilities. *Omega Satellite Prods. Co. v. City of Indianapolis*, 694 F.2d 119, 123 (7th Cir. 1982). While the Court is mindful of the potential injury LPS faces, it bears repeating that equity jurisdiction exists only to remedy legal wrongs, and without some showing of a probable right there is no basis for invoking it.  *Roland*, 749 F.2d at 387.  The Court therefore denies LPS's motions for injunctive relief.

### III. LPS's Request to Seal Portions of the Evidentiary Hearing

At the close of the May 17, 2013 hearing, Fidlar and LPS jointly moved that the transcript of and evidence received at the hearing be kept out of the public domain while the Court considered LPS's motion for a preliminary injunction.  The Court granted a temporary "protective order based on all the evidence received . . . for purposes of the preliminary injunction."  Evid. Hr'g Tr. at 280.  The Minute Entry for the May 17, 2013 hearing notes a "[j]oint oral motion for protective order *pending ruling*.  So ordered" (emphasis added).  Then, in a June 4, 2013 Text Order, the Court allowed the parties' Proposed Findings of Fact and Conclusions of Law, ECF Nos. 24 and 28, to be filed under seal in keeping with the protective order.

Consequently, the temporary protective order naturally expires upon the filing of this Order.  Nevertheless, the Court must still address some related filings.  On June 14, 2013, Fidlar filed a Motion to Unseal the Case, ECF No. 30, which the Court finds is rendered moot by the expiration of the protective order.  On July 1, 2013, LPS moved for leave to file its Response to Fidlar's motion under seal, ECF No. 33, and filed that Response with several exhibits under seal as ECF No. 34.  In its Response, LPS asks to seal several categories of information that it considers trade secrets or other confidential information that were disclosed at the Evidentiary

Hearing and in the Findings of Fact and Conclusions of Law.  Although this request is made in a response and not as a motion, the Court will not put form over function, and in the interest of fairness, will give full consideration to LPS's request.  In order to conduct its analysis, the Court now grants LPS's motion for leave to file its Response under seal so that the Response may be filed with the Court.  Having dealt with the procedural quirks surrounding LPS's request, the Court now turns to the merits.

In general, litigants' privacy interests must be weighed against the public's interest in having a transparent judicial system.  As noted by the Seventh Circuit, "[m]any a litigant would prefer that the subject of the case—how much it agreed to pay for the construction of a pipeline, how many tons of coal its plant uses per day, and so on—be kept from the curious (including its business rivals and customers) . . . ."  *Union Oil Co. of California v. Leavell*, 220 F.3d 562, 567 (7th Cir. 2000).  But that is not an adequate reason to ignore "the tradition that litigation is open to the public . . . .  People who want secrecy should opt for arbitration.  When they call on the courts, they must accept the openness that goes with subsidized dispute resolution by public (and publicly accountable) officials."  *Id.* at 567–68 (citations omitted).

The interest of the public "does not always trump the property and privacy interests of the litigants, but it can be overridden only . . . if there is good cause."  *Citizens First Nat. Bank of Princeton v. Cincinnati Ins. Co.*, 178 F.3d 943, 945 (7th Cir. 1999).  At the discovery stage, for example, that balancing of interests is reflected in Federal Rule of Civil Procedure 26(c)(1)(G): "The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way."  Fed. R. Civ. P. 26(c)(1)(G).  Even though pretrial

discovery is usually conducted in private, good cause is required because "the public at large pays for the courts and therefore has an interest in what goes on at *all* stages of a judicial proceeding." *Citizens First Nat. Bank*, 178 F.3d at 945 (emphasis added).

As a case progresses, when a court finds it necessary to consider certain information in making a decision, that information should ordinarily be made available to public scrutiny in order to preserve the integrity of the judicial process. *See, e.g.*, *Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 545 (7th Cir. 2002); *see also Union Oil Co.*, 220 F.3d at 567–68 (7th Cir. 2000) ("Judges deliberate in private but issue public decisions after public arguments based on public records. The political branches of government claim legitimacy by election, judges by reason. Any step that withdraws an element of the judicial process from public view makes the ensuing decision look more like fiat, which requires compelling justification."). Therefore, "those documents, usually a small subset of all discovery, that influence or underpin the judicial decision are open to public inspection unless they meet the definition of trade secrets or other categories of bona fide long-term confidentiality." *Baxter*, 297 F.3d at 545.

Here, the information LPS now wishes to keep secret—such as a basic overview of the methods LPS uses to collect data and "the harm LPS has suffered as a result of Fidlar's conduct"—was considered by the Court in reaching its decision on the preliminary injunction, which weighs in favor of disclosure. The fact that LPS included some of the information in its unsealed Amended Complaint—discussed in greater detail below—also demonstrates the relevance of the information. Therefore, disclosure is warranted even at this early stage in the litigation, unless LPS establishes good cause. In evaluating whether there is good cause to seal documents in the record, the question now before the Court is: does the information LPS seeks to seal qualify as "trade secrets or other categories of bona fide long-term confidentiality"? *Baxter*,

297 F.3d at 545.

LPS contends that certain subjects discussed at the May 17, 2013 hearing "constitute trade secrets or otherwise confidential business information," claims it derives economic value from keeping that information confidential, and describes efforts LPS takes to preserve confidentiality.  Under Illinois law, a trade secret "(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality."  765 ILCS § 1065/2(d).  LPS does not define the phrase, "otherwise confidential business information."  In any event, LPS does not indicate which information falls within each category in its argument, arguing instead only that none of the subjects are generally known, and that LPS employs measures to promote confidentiality.

"[T]he harm LPS has suffered as a result of Fidlar's conduct" is central to LPS's request for injunctive relief, so it is an inappropriate subject to seal in the record.  But LPS has also not established that the other information, which concerns LPS's methods of amassing data, constitutes trade secrets or other confidential information.  In particular, LPS requests protection for "the specific number of county recorders and assessors with which LPS does business countrywide, the various methods LPS employs to retrieve county recorders' property data, the combination of data collection methods LPS uses, [and] the locations where LPS uses specific methods."  It is plausible that LPS derives economic value, actual or potential, from keeping secret its methods of amassing data, but unlikely that the vague descriptions of those methods at issue here require filing under seal.  LPS understandably would prefer to keep certain details from the public and from its competitors, but it has no legal basis for doing so.  *See Union Oil*,

220 F.3d at 567–68 ("Many a litigant would prefer that the subject of the case . . . be kept from the curious (including its business rivals and customers) . . . [but w]hen they call on the courts, they must accept the openness that goes with subsidized dispute resolution by public (and publicly accountable) officials.").   The Court's conclusion might be different if LPS's training materials, procedural manuals, or proprietary software were themselves in danger of disclosure. *See, e.g., Hamilton v. State Farm Mut. Auto. Ins. Co.*, 204 F.R.D. 420, 423 (S.D. Ind. 2001). LPS has not established, however, that the largely non-specific descriptions of its business practices deserve comparable protection.

Moreover, the fact that LPS takes steps to generally promote confidentiality does not demonstrate that it is invested in specifically maintaining secrecy over the information it desires to keep under seal in this case.   So, LPS's practice of requiring non-disclosure agreements as a general matter does not speak to the value of keeping the information at issue here confidential, nor does it reveal a concerted effort to keep such information confidential.   And, some of the information LPS now argues is confidential is disclosed in its unsealed Amended Counterclaim, ECF No. 19.   For example, LPS argues that the fact that 44 counties have terminated LPS's online access to their records is information that should be kept under seal, but included the phrase, "approximately 44 counties terminated their agreements with LPS to provide unlimited internet access to their records," on the second page of its Amended Counterclaim, ECF No. 19. Similarly, LPS states in paragraph seven of its Amended Complaint that "LPS collects property data from counties nationwide on a daily or weekly basis," but now argues that the frequency with which it gathers information should be treated as confidential.

For all of the foregoing reasons, the Court declines to grant LPS's request to seal portions

of the record.  With the exception of ECF No. 34,[10] all previously sealed items on the docket will now be unsealed.

## CONCLUSION

For the reasons set forth above, the Court hereby denies LPS's Motion to Dismiss, ECF No. 35.  The Court also denies LPS's Emergency Motion for a Temporary Restraining Order, ECF No. 14, and Motion for a Preliminary Injunction, ECF No. 9.  Fidlar's Motion to Unseal the Case, ECF No. 30, is Moot, and the Court grants LPS's Motion for Leave to File its Response Under Seal, ECF No. 33.  The Clerk is directed to unseal ECF Nos. 25, 28, and 31-1.


IT IS SO ORDERED.


Entered this 8th day of November, 2013.

s/ Sara Darrow

_____

SARA DARROW
UNITED STATES DISTRICT JUDGE

---

[10] The Court finds good cause to retain these documents under seal because even though much of the information they contain is available elsewhere in the record, it is presented in a significantly altered form (such that it is relevant only to the question of whether to seal other, now unsealed, portions of the record).