UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| FIDLAR TECHNOLOGIES, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | |
| ) | Case No. 4:13-cv-4021-SLD-JEH |
| LPS REAL ESTATE DATA SOLUTIONS, ) | |
| INC., ) | |
| ) | |
| Defendant. ) | |
| ) | |
| LPS REAL ESTATE DATA SOLUTIONS, ) | |
| INC., ) | |
| ) | |
| Counter-Claimant, ) | |
| ) | |
| v. ) | |
| ) | |
| FIDLAR TECHNOLOGIES, ) | |
| ) | |
| Counter-Defendant. ) | |
| ) | |
| ) | |

ORDER

Before the Court is Defendant LPS Real Estate Data Solutions, Inc.'s ("LPS") Supplemental Motion for Attorney Fees, ECF No. 115.  The motion incorporates by reference an earlier LPS motion for fees, ECF No. 92.  In addition, Plaintiff Fidlar Technologies ("Fidlar"), in its response to the initial motion for fees, ECF No. 107, contests certain portions of LPS's claimed costs as the prevailing party.  *See* Bill of Costs, ECF No. 94.  For the following reasons, LPS's motion for attorney's fees is DENIED; its bill of costs is ALLOWED in its entirety.

1

## BACKGROUND

The Court granted summary judgment for LPS on all of Fidlar's claims on March 5, 2015. ECF No. 89. No claims remaining, judgment entered on March 23, 2015. ECF No. 91. LPS's motion for fees followed on April 6, 2015, along with its bill of costs. On April 21, 2015, both parties requested that the Court refrain from ruling on the fees motions until the pending appeal was resolved. ECF No. 112. After it was, *see* Mandate of USCA, ECF No. 117, on February 4, 2016, LPS filed its supplemental motion for fees related to litigation of the appeal.

## DISCUSSION

### I. Legal Standard on Motions for Costs and Attorney's Fees

Ordinarily, costs other than attorney's fees are allowed to the prevailing party in a civil action. Fed. R. Civ. P. 54(d)(1). These expenses will be allowed only if they are reasonable, both in amount and necessity to the litigation. *Shah v. Vill. of Hoffman Estates*, No. 00-C-4404, 2003 WL 21961362, at *1 (N.D. Ill. Aug.14, 2003). "The rule provides a presumption that the losing party will pay costs but grants the court discretion to direct otherwise." *Rivera v. City of Chicago*, 469 F.3d 631, 634 (7th Cir. 2006). A clerk may tax undisputed costs without need for the prevailing party to file a motion with the court. Fed. R. Civ. P. 54(d)(1).

By contrast, "[a] claim for attorney's fees and related nontaxable expenses must be made by motion[.]" Fed. R. Civ. P. 54(d)(2)(A). This motion must be filed no more than 14 days after the entry of judgment, and must state or estimate the amount sought, as well as specifying the statute, rule, or other grounds entitling the movant to a fee award. *Id.* R. 54(d)(2)(B). A motion is required because, while a prevailing party is presumptively entitled to costs, he is not normally entitled to attorney's fees under the "American Rule," the "bedrock principle [by which] . . . [e]ach litigant pays his own attorney's fees, win or lose, unless a statute or contract provides

otherwise." *Baker Botts L.L.P. v. ASARCO LLC*, 135 S. Ct. 2158 (2015) (quoting *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 252–253 (2010)).

    II.    **Analysis**

    a.  **Costs**

Fidlar argues that LPS is not entitled to some of the deposition, copying, and subpoena fees it claims because those costs were incurred in pursuit of LPS's voluntarily dismissed counterclaims, Resp. Mot. Fees 17–18; and that as a matter of law, LPS is not entitled to the telephone call expenses and courier service fees it has included in the bill of costs, *id.* at 20. LPS responds that the deposition, subpoena, and copy fees Fidlar contests arose from depositions used by Fidlar in its case in chief against LPS, Rep. Mot. Fees 8–9, and that all of the costs to which Fidlar objects categorically are in fact taxable, *id.* at 9–10.

    1.  **Costs Associated with Counterclaims**

Fidlar argues that the numerous depositions of county recorders in this case were only taken to defend against LPS's counterclaims for tortious interference, upon which LPS did not prevail because it dismissed them. Resp. Mot. Fees 17. *See* Stip. Dismissal, ECF No. 67 (stipulating to the dismissal of Counts I-III of LPS's counterclaim). LPS's counterclaim accused Fidlar of inducing 81 counties to terminate contracts with LPS, *see* Am. Counterclaim 13–17, ECF No. 19, and so Fidlar argues that in order to defend against the claim, and for that purpose only, it was required to depose the recorders of these counties, at substantial expense to both parties. Resp. Mot. Fees 17. Essentially, Fidlar is claiming that the costs associated with the deposition of each county recorder was a consequence only of claims that are wholly distinct from the suit it lost against LPS.

However, as LPS observes, Fidlar argued consistently during the litigation that a key fact for its own claims was whether and to what extent LPS had been authorized by the various counties to use "web harvesting" technology on their databases. *See* Fidlar's Resp. Mot. Quash 6, ECF No. 54 ("To prove its case in chief, Fidlar must provide evidence regarding what, if any, authorization LPS received from the counties for use of its web-harvester."). Most tellingly, Fidlar relied upon, and the Court reviewed, extensive deposition testimony from various county recorders in defending its claims at summary judgment. *See, e.g.*, Fidlar Resp. Mot. Summ. J. 68–74, ECF No. 82. Fidlar's argument at summary judgment was that LPS had violated the terms of its agreements with each of these county recorders, and had thus accessed its "Laredo system" in an unauthorized manner. *Id.* at 71–72. In support, Fidlar relied heavily on deposition testimony from the recorders about how the counties had understood the contracts they made with LPS. *Id.* Fidlar cannot now assert that this testimony, and the costs associated with its collection, were not integral to claims upon which LPS is admittedly the prevailing party.

These being Fidlar's only objections to LPS's transcript, copying, and subpoena-related fees, those fees are allowed in whole.

### 2. Costs for Faxes, Couriers, and Telephone Calls

The costs to which Fidlar objects as categorically inappropriate, listed in LPS's bill of costs as "Other costs" and totaling $2,170.68, include fax and courier expenses, messenger service fees, FedEx costs, and telephone calls. *See* Costs Documentation 15–22, Bill of Costs Ex. 1, ECF No. 94-1. "To be compensable . . . a particular expense must fall into one of the categories of costs statutorily authorized for reimbursement." *Cefalu v. Vill. of Elk Grove*, 211 F.3d 416, 427 (7th Cir. 2000). Allowable costs include court fees, "[f]ees for printed or electronically recorded transcripts necessarily obtained for use in the case," 28 U.S.C. § 1920(2);

4

"[f]ees and disbursements for printing and witnesses," *id.* § 1920(3); and "[f]ees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case," *id.* § 1920(4). The Seventh Circuit "has construed section 1920 to include amounts spent on filing fees, postage, telephone calls and delivery charges[.]" *Tchemkou v. Mukasey*, 517 F.3d 506, 512 (7th Cir. 2008). Each of the expenses that LPS seeks to tax as an "other cost" falls within the category identified by *Tchemkou*, which can be broadly understood as the communicational overhead incurred by attorneys going about the work of litigation. Certainly, Fidlar does nothing to suggest a reason why these costs were not for items and services necessarily obtained for use in the case. *See* 28 U.S.C. § 1920(2).[1] Having reviewed these "other" costs, the Court allows them in whole.

In sum, all of LPS's costs are allowed.

**b. Attorney's Fees**

LPS seeks an award of attorney's fees, both for litigation before this Court and on the ensuing appeal, arguing that it is entitled to the award under the Illinois Computer Crime Prevention Law ("CCPL"), 720 ILCS 5/17-51, and that even if it is not, the Court should exercise its inherent power to impose sanctions to award some or all of LPS's attorney's fees. Mem. Supp. Mot. Fees 12–21, ECF No. 95.

**1. CCPL Fee Shifting**

The CCPL is primarily a criminal statute forbidding computer tampering, but contains a civil remedy provision, 720 ILCS 5/17-51(c), which provides that "the court may award to the prevailing party reasonable attorney's fees and other litigation expenses." LPS argues that it was

---

[1] The one case that Fidlar cites in support of its argument that costs for such items are untaxable does not stand for that proposition. *See Republic Tobacco Co. v. N. Atl. Trading Co.*, 481 F.3d 442, 446–47 (7th Cir. 2007) (holding that district court erred in awarding prevailing-party costs to a defendant who lost a jury trial but succeeded on a post-trial motion to reduce damage award).

the prevailing party on Fidlar's CCPL claim, which was dismissed by the Court at summary judgment, and thus is entitled to fees. Fidlar responds that although the verb "may" clearly grants discretion to award fees, Illinois's Supreme Court has not interpreted the CCPL's grant of discretion directly, and thus, this Court should be guided in its exercise of that discretion by Illinois's interpretation of a similar fee shifting clause in Illinois's Consumer Fraud and Deceptive Business Practices Act ("Consumer Fraud Act" or "CFA"). Resp. Mot. Fees 6–7. *See Krautsack v. Anderson*, 861 N.E.2d 633, 643 (Ill. 2006).

As both parties agree, the Illinois Supreme Court has not interpreted the fee shifting provision of the CCPL. Accordingly, to the extent that the Court must interpret the CCPL's grant of discretion and constraints placed upon that grant, the Court must predict how the Illinois Supreme Court would rule on the issue. *See Allen v. Transamerica Ins. Co.*, 128 F.3d 462, 466 (7th Cir. 1997).

The Court is persuaded that it is appropriate to look to the Illinois Supreme Court's interpretation of the CFA's fee shifting clause. The language the Consumer Fraud Act uses to allow fee awards is very similar to the CCPL's language. *See* 815 ILCS 505/10a(c) ("[T]he Court may grant injunctive relief where appropriate and may award . . . reasonable attorney's fees and costs to the prevailing party."). In interpreting this language, the Illinois Supreme Court has noted that "the word 'may' ordinarily connotes discretion," *Krautsack*, 861 N.E.2d at 643, and mentions "several factors or criteria a trial court may consider when ruling on a fee petition under section 10a(c)," *id.* at 644. Thus, while the Illinois Supreme Court determined, as this Court does with respect to the CCPL, that the fee shifting statute in question grants discretion to trial courts with the permissive "may," it also determined that the grant was not standardless, and identified several "factors or criteria" that a trial court should consider in the exercise of its

6

discretion. While, as LPS observes, Mot. Fees 14–15, the two statutes aim to protect different parties from different kinds of harm, the identity of language in the fee shifting clauses, and the usefulness of the Illinois Supreme Court's criteria in the present case weigh in favor of considering those factors here.

> These factors "include, but are not limited to," *Kraustsack*, 861 N.E.2d at 644:
>
> (1) the degree of the opposing party's culpability or bad faith;
>
> (2) the ability of the opposing party to satisfy an award of fees;
>
> (3) whether an award of fees against the opposing party would deter others from acting under similar circumstances;
>
> (4) whether the party requesting fees sought to benefit all consumers or businesses or to resolve a significant legal question regarding the Act; and
>
> (5) the relative merits of the parties' positions.

*Id.* The term "bad faith" is not more explicitly defined as applied to CCPL fee shifting. In a more general sense, the Seventh Circuit has explained:

> Exactly what constitutes bad faith has been the subject of some uncertainty. Courts have used phrases such as harassment, unnecessary delay, needless increase in the cost of litigation, willful disobedience, and recklessly making a frivolous claim. . . . We have also noted, when analyzing the meaning of "unreasonably and vexatiously" in the similar context of 28 U.S.C. § 1927, that the term "bad faith" has both a subjective and objective meaning, and we often treat reckless and intentional conduct equally. . . . Furthermore, bad faith may occur beyond the filing of the case and may be found, not only in the actions that led to the lawsuit, but also in the conduct of the litigation.

*Mach v. Will Cty. Sheriff*, 580 F.3d 495, 501 (7th Cir. 2009) (internal citations and quotation marks omitted). In any event, the *Krautsack* factors suggest that a court evaluate the "degree" of a party's bad faith, which implies a fact-bound inquiry taking into account all of a party's behavior over the course of litigation both objectively, and as indicia of the party's intent.

7

Neither party disputes that LPS is the prevailing party in this case, having had its motion for summary judgment on all claims granted in whole. The question is thus whether LPS should, as prevailing party, be awarded attorney's fees.

Much of LPS's argument in favor of fees under the CCPL turns on the first *Krautsack* factor—that Fidlar assertedly acted in bad faith by filing this lawsuit, or in litigating it. The evidence does not support the claim, however.

LPS points to emails circulated amongst Fidlar employees after individual counties became aware that LPS had been gathering land records from the counties without paying print fees or logging minutes on the Laredo system. According to LPS, these emails show that Fidlar was caught flat-footed when some county recorders' offices became upset, and, worried that Fidlar would appear to have been negligent in protecting the counties' data, decided that the best strategy was to blame LPS for having taken the data, and pursue litigation against LPS as a way of showing the counties that Fidlar would stand up for its clients. Mot. Fees 5–7. *See, e.g.*, Mar. 13, 2013 email, Mot. Fees Ex. 12 ("I would give [the recorder] time to make the calls and get all nice and paranoid (she will find that the others also have LPS users with no minutes being used.) After that, it's time for you to swoop in with a call."). Thus, the argument goes, the lawsuit must not have been based on an actual belief that LPS had violated the law. LPS further argues that Fidlar was aware at some time before it filed suit that LPS was not logging any minutes on its accounts, and knew that it was not losing any revenue from LPS's behavior, either in the form of subscription fees directly lost, or in the form of lost business from disgruntled counties. Mot. Fees 3–4. Thus, LPS claims that Fidlar's suit was brought without a basis in a perceived harm to Fidlar.

There is a difference, however, between having filed suit strategically and having filed a suit with knowledge that the claims brought were without merit. Ultimately, LPS can point only to the statements of a few non-lawyers at Fidlar who saw the possibility of vilifying and suing LPS as having a strategic benefit for their company—as, surely, almost all corporate lawsuits do. To observe that several non-lawyers saw a financial upside to suit is to observe very little about the merits of a suit that was ultimately filed with full benefit of consultation with counsel— counsel who then ably tried the case from start to finish. Certainly, there was no facial deficiency in the legal theories and factual allegations ultimately brought, to the extent that the Court denied LPS's motion to dismiss these claims. *See* Nov. 8, 2013 Order, ECF No. 42. And, although Fidlar ultimately did not prevail on its claims, it mounted a credible case based on novel interpretations of federal and Illinois law, which both this Court and the Seventh Circuit analyzed at some length. *See* Mar. 5, 2015 Order, ECF No. 89; *Fidlar Techs. v. LPS Real Estate Data Sols., Inc.*, 810 F.3d 1075 (7th Cir. 2016). Thus, nothing about the merits of the claims themselves suggests that they were brought in bad faith or to harass. *Compare with TruServ Corp. v. Ernst & Young*, *LLP*, 876 N.E.2d 77, 83 (Ill. App. 2007) (finding plaintiff acted in bad faith, where, inter alia, it "pressed its case on several issues where it had no chance of success"). And LPS's observation that Fidlar "knew" it had not suffered harm misses the mark; by LPS's own argument, Fidlar clearly thought that it was suffering reputational and potentially financial harm as a consequence of LPS's search techniques with the individual counties.

LPS also alleges that the way in which Fidlar litigated the case indicates or constitutes its bad faith. LPS complains that Fidlar noticed 55 depositions of county officials, when it could have sought the information in a less costly way, Mot. Fees 8; that it filed an unsuccessful motion to compel production of a privileged memorandum filed by LPS's in-house counsel, *id.*

at 8–9; that it sought admission of supplemental answers to interrogatories after the close of discovery, *id.* at 9; and that it was unwilling to participate in alternative dispute resolution, *id.* Fidlar responds that the county recorders' deposition testimony was material to its defense against LPS's counterclaims, Resp. Mot. Fees 13; that its motion to compel was not frivolous merely because it was ultimately unsuccessful, *id.*; that its request for admission was similarly not taken in bad faith just because lost, *id.*; and that the parties did negotiate amongst themselves in an effort to settle the case, and did not think that mediation would be productive after the failure of these other informal negotiations, *id.* at 14.

Fidlar is correct that neither of its losing motions appear on their face, or have been shown by other evidence, to have been taken for the purpose of "harassment, unnecessary delay, [or] needless increase in the cost of litigation." *Mach*, 580 F.3d at 501. The mere fact that they were unsuccessful shows nothing, and LPS has not met its burden as the party seeking attorney's fees to show that they were taken intentionally for some prohibited purpose, or even recklessly. Further, parties are not required to participate in arbitration, and LPS has explained that it did, through other channels, attempt to achieve resolution of the claims at issue. Finally, while the number of depositions in this lawsuit was unusually high, Fidlar's explanation—that it needed to conduct the depositions in order to defend itself against tortious interference claims—is plausible. Furthermore, as noted above, Fidlar relied in its opposition to summary judgment upon testimony by county officials about their understanding of the contracts between LPS and the counties, testimony that Fidlar could reasonably have believed would be more reliable when acquired through depositions. In sum, none of the behavior LPS complains of lies beyond the scope of normal, if aggressive, litigation, and thus does not bespeak bad faith.

Finally, the parties disagree about whether sharing discovery materials with counties interested in suing LPS was a violation of the parties' Agreed Protective Order, ECF No. 62, and to what extent that means Fidlar acted in bad faith. LPS asserts Fidlar's counsel, which separately represented two of the counties in their own suits against LPS, used excerpts of deposition testimony in those cases that were not publicly available in this case, and thus, the depositions must have been used in those cases in violation of the Agreed Protective Order. Mot. Fees 10–12. Fidlar counters that none of the deposition testimony excerpted in other litigation had been marked "confidential" or "attorney's eyes only," and thus, any material that it or its counsel may have shared for the purposes of other lawsuits was not shared in violation of the Agreed Protective Order. Resp. Mot. Fees 16.

While it is true that LPS concedes it did not mark these depositions as confidential, the Agreed Protective Order states: "*All information* which is or has been produced or discovered in this litigation, regardless of whether designated confidential, shall be used solely for the prosecution or defense of this litigation unless the information is available to the general public without a breach of the terms of this Agreed Protective Order." Agr. Protective Order 2, ¶ 2 (emphasis added). It appears that counsel for Fidlar nevertheless proceeded to use this information in the later-filed lawsuits against LPS, in violation of the Agreed Protective Order. Be that as it may, those lawsuits were not filed by Fidlar, and Fidlar was not a party to them. LPS does not seek sanctions against Fidlar's counsel, but rather to show that Fidlar acted in bad faith in the instant litigation. The only way that later use of these depositions would show bad faith on Fidlar's part in this litigation would be if Fidlar had filed the suit or sought the

11

depositions with the aim of furnishing them inappropriately to the counties. But there is no suggestion of this, nor reason to suspect it, and LPS does not argue as much in any case.[2]

LPS has failed to show that Fidlar acted in bad faith. The outcomes of the other *Krautsack* factors are more equivocal, but ultimately do not suggest that fees should be awarded, either. The second *Krautsack* factor, Fidlar's ability to pay, does not militate against an award of fees, since Fidlar seems well able to pay them. *See* Mot. Fees 16. Third, an award of fees against the losing plaintiff in this case might conceivably have a chilling effect on other similar suits, since potential plaintiffs would know that it was marginally more likely that they would be forced to bear their opponents' legal fees if their claims were to fail. However, the Court notes that the use of the CCPL and its federal analogue, the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, in the instant litigation was so unusual that the Court was unable to discover any similar applications of those statutes' civil suit provisions. *See* Mar. 5, 2015 Order at 16 (explaining that in the ordinary case, the CFAA covers "attacks by disgruntled programmers who decide to trash [an] employer's data system on the way out" (quoting *Int'l Airport Ctrs., L.L.C. v. Citrin*, 440 F.3d 418, 420 (7th Cir. 2006)). In other words, there does not seem to have been a large body of existing corporate litigation under these statutes whose flow might be increased or decreased by an award of fees here. The third factor cuts neither way.

---

[2] It is also surely the case that a breach of the Agreed Protective Order involving only material designated neither "confidential" nor "attorney's eyes only" is a much less serious breach, if it is a breach at all. By LPS's admission, the Agreed Protective Order governs all information "produced or discovered in this litigation." Agr. Protective Order 2, ¶ 2. The category is so all-encompassing that it is hard to take seriously the Order's formulaic initial recitations that good cause exists to justify it when "[a]s a general proposition, pretrial discovery must take place in the [sic] public unless compelling reasons exist for denying the public access to the proceedings." *American Tel. & Tel. Co. v. Grady*, 594 F.2d 594, 596 (7th Cir. 1978*), cert. denied*, 440 U.S. 971 (1979). If good cause exists to justify restrictions on use for every single discovered item in this case, then the Agreed Protective Order certainly does not explain why this should be so. Where there is no indication that a good cause determination has been made for the secrecy or restricted use of items governed by a protective order, a court will independently review whether such cause exists before approving any sort of sanction—or, in the instant case, making a determination of bad faith. *See Jepson, Inc. v. Makita Elec. Works, Ltd.*, 30 F.3d 854, 858–59 (7th Cir. 1994) (independently determining whether good cause existed to prevent discussion of confidential discovery material in another matter, where the judge who issued a protective order appeared not to have made such a finding).

Fourth, Fidlar does not appear to have been seeking to clarify major legal uncertainties surrounding either statute, or to have been seeking to benefit other similarly situated companies. The fourth *Krautsack* factor does not augur against an award of fees against Fidlar (presumably, this factor exists so that courts may consider the non-egoistic motives individuals or entities may have had in pursuing litigation). Fifth, while this Court ultimately granted LPS's motion for summary judgment, the "relative merits," *Krautsack*, 861 N.E.2d at 644, of the parties' positions were not so asymmetrical as to warrant a punitive award of attorney's fees (again, presumably the purpose of this factor). No factor suggests fees should be awarded.

*Krautsack* and other cases caution that, in the list of factors considered above, "no single factor is necessarily controlling, nor is the list an exhaustive one." *Graunke v. Elmhurst Chrysler Plymouth Volvo, Inc.*, 617 N.E.2d 858, 864 (Ill. Ct. App. 1993) *abrogated by Krautsack*, 861 N.E.2d 633. Such pointedly non-exclusive but apparently exhaustive lists tend to collapse into holistic analyses, lists of pointers for courts to consider rather than a "test" that could be applied in any mechanical or consistent fashion. *See DeGuelle v. Camilli*, 724 F.3d 933, 938 (7th Cir. 2013) ("That brings the number of factors to 11, though in a later case we learn that 'the overarching task' in applying the doctrine of collateral estoppel is 'to make a holistic, discretionary determination regarding fundamental fairness.' . . . . Holistic analysis is the opposite of dissecting an issue into parts." (citation omitted)). In any event, the Court can discern no other factors than those considered above that would point in favor of an award of attorney's fees to LPS.

The parties spend some time debating whether the fee determination should rest on the multi-factor test, or on a more basic initial determination of whether Fidlar acted in bad faith, followed by a consideration of the factors only if bad faith is found. Mot. Fees 14–15; Resp.

13

Mot. Fees 6–7, 8–9. The debate is occasioned by *Krautsack*'s determination, in the context of a consumer fraud statute's fee-shifting provision, that prevailing plaintiffs need not make an initial showing of bad faith to be awarded fees, but prevailing defendants must. *Krautsack*, 861 N.E.2d at 647. The Court suspects that requiring a bad-faith showing would not make sense in applying the CCPL, since CCPL plaintiffs—typically corporations with computer networks—are less in need of preferential treatment than are defrauded consumers. But the question is immaterial to this case; Fidlar neither acted in bad faith nor deserves to be made to pay attorney's fees on the basis of any other factors.

### 2. "Inherent Power" Sanctions

LPS also asks the Court to award it attorney's fees on the basis of the Court's inherent power to punish Fidlar for abuse of the judicial process. Mot. Fees 12.

Courts may sanction parties or attorneys pursuant to 28 U.S.C. § 1927, various portions of the Federal Rules of Civil Procedure, or their inherent power to impose sanctions. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991). The inherent power to impose sanctions "extends to the full range of litigation abuses," and also "fill[s] in the interstices" between statute and rule where sanctionable conduct still lies. *Id.* at 46–47. "[A] sanction under the inherent power is appropriate only where the party 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Corley v. Rosewood Care Ctr., Inc.*, 142 F.3d 1041, 1058 (7th Cir. 1998) (quoting *Chambers*, 501 U.S. at 45–46).

As explained above, however, Fidlar did not act in bad faith; nor did it act "vexatiously, wantonly, or for oppressive reasons." *See Kotsilieris v. Chalmers*, 966 F.2d 1181, 1184 (7th Cir. 1992) ("[O]ur past decisions have interpreted vexatious to mean either subjective or objective bad faith."); 65 C.J.S. *Negligence* § 95 (2016) ("[W]antonness is essentially an attitude or a state

of mind, which includes to a greater or lesser extent the elements of consciousness of one's conduct, intent to do or omit the act in question, realization of the probability of injury to another, and reckless disregard of consequences."); *Stive v. United States*, 366 F.3d 520, 522 (7th Cir. 2004) (describing the form of words used in *Chambers* as "the canonical formula for the bad-faith exception to the American rule" and interpreting that exception as encompassing frivolous claims made either intentionally or recklessly). None of the evidence LPS adduces as showing bad faith does more to show that Fidlar brought frivolous claims recklessly than it does to show that frivolous claims were brought intentionally. As explained above, the claims were not frivolous, and the evidence of bad faith, either via recklessness or with intent, is very weak. *See id.* at 522 ("[O]ne is reminded that recklessness is frequently in the law a near synonym for intentionality.").

## CONCLUSION

Accordingly, Defendant LPS's Supplemental Motion for Attorney's Fees, ECF No. 115, is DENIED. Defendant's Bill of Costs, ECF No. 94, is ALLOWED in its entirety.


Entered this 8th day of September, 2016.

s/ Sara Darrow<br>
SARA DARROW<br>
UNITED STATES DISTRICT JUDGE